STEWART TITLE GUARANTY COMPANY, et al., Appellants,

v.

David K. BECKER and Joni Becker, Appellees.

No. 13–94–334–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 22, 1996.

Rehearing Overruled Oct. 3, 1996.

Douglass L. Anderson, Emmett Cole, Jr., Cole, McManus, Cole & Easley, Victoria, Frank E. Weathered, Dunn & Weathered, Randal W. Hill, Rick Rogers, Porter, Rogers, Dahlman, Gordon & Lee, Ben A. Donnell, M. W. Meredith, Jr., Clay E. Coalson, Meredith, Donnell & Abernethy, Corpus Christi, for appellants.

William R. Edwards, Edwards & Terry, William Robert Anderson, III, Sorrell, Anderson & Lehrman, Corpus Christi, David M. Gunn, Rothenberg & Gunn, Houston, for appellees.

Before SEERDEN, C.J., and FEDERICO G. HINOJOSA, Jr. and RODRIGUEZ, JJ.

## OPINION

RODRIGUEZ, Justice.

This suit involves the alleged failure of title to a ranch purchased by David Becker. David and Joni Becker sued Stewart Title Guaranty Company, William Pippin & James Gunn, Harold Haynes, Four West, Inc., and Morris Bingham for numerous claims relating to the alleged failure of title. Following a jury trial, the court entered a judgment generally favorable to the Beckers. Stewart Title appeals by nine points of error, Pippin & Gunn raise eighteen points of error, Haynes and Four West, bring two reply points of error, Bingham raises four points of error, and the Beckers assert two cross-points of error.

In 1984, David Becker, a Corpus Christi geologist, purchased a ranch from William Pippin and James Gunn (Pippin & Gunn). Most, if not all, of the ranch used to belong to Morris Bingham. In 1981, Bingham executed a real-estate sales contract (Contract) in which he agreed to sell 700 acres of land to Four West "and/or Assignees." Four West then assigned all its rights, title, and interest in the Contract and proposed purchase of real property as described therein to Pippin & Gunn. Later that year, Bingham executed a warranty deed conveying property to Pippin & Gunn. The deed gave descriptions for two parcels of land. Parcel 1 was situated north of the centerline of the Frio River and contained 642.528 acres. Parcel 2 was situated south of the centerline of the Frio River and contained 8.418 acres. Stewart Title Guaranty Company (Stewart Title) issued Pippen & Gunn a title insurance policy covering both parcels.

After Pippin & Gunn bought the property, Pippin advised Harold Haynes, president of Four West, that he wanted to sell it. At that time, Haynes knew that Becker wanted to buy a hunting ranch. Becker saw the property and agreed to buy it. On November 22, 1983, Pippin & Gunn executed an Earnest–Money Contract in which they agreed to sell Becker 650 acres of land. The property description divided the land into Parcels 1 & 2. The sale closed on February 15, 1984. Stewart Title, through its agent, McMullen County Title Company, issued an owner's title policy to Becker which covered the transaction. The policy described the property as one large tract and did not identify it as either Parcel 1 or 2. The policy covered 642.528 acres of land, more or less, and made no reference to Parcel 2.

### The Alleged Title Problems

The Beckers allege that the title conveyed to them was defective because certain prop-

erty conveyed by Pippin & Gunn belonged to the Lozano family. By warranty deed dated May 22, 1974, Bingham had conveyed a portion of land to Pete Lozano. Also, by deed dated October 30, 1974, Naylor Ranch Company and others conveyed to Pete Lozano land included in the deeds from Bingham to Pippin & Gunn and thereafter from Pippin & Gunn to Becker. Additionally (after commencement of this suit), the Beckers learned that another portion of the land conveyed by Bingham to Pippin & Gunn and by Pippin & Gunn to the Beckers was never owned by Bingham, and the survey thereof, along with the metes and bounds description, "had been made up." As a result, Becker did not receive title to any land described as Parcel 2, and he received defective title to the land described as Parcel 1.

The Beckers sued Stewart Title, Bingham, Harold Haynes, Four West, and Pippin & Gunn alleging violations of the DTPA. Stewart Title was also sued for breach of contract and violation of Article 21.21 of the Texas Insurance Code. Stewart Title and Bingham were both sued for negligence. Bingham was sued for breach of the warranties of title in his warranty deed to Pippin & Gunn, and Pippin & Gunn were sued for breach of contract and breach of the warranties of title in their deed to David Becker.

After the parties closed, the Beckers' counsel, William Edwards, argued three motions for directed verdict to the trial court. The first motion related to what Edwards called "the Lozano out tract." [1] Edwards asked for a directed verdict on the Beckers' right to recover under the policy for the value of that land. The court ruled as a matter of law that title to that property had failed. The second motion was that the warranty of title to that same tract had been breached; that is, there was a breach of the deed warranties regarding the Lozano out tract. The court granted that motion as well. The third motion was:

> That the only issue that needs to go to the jury with respect to my deed claim against Bingham and Pippin and Gunn with regard to Parcel 2 is the value of Parcel 2 at the time of the close in February 1984. The

rest of the cause of action, if there is one because that's a matter of law, is established from the facts, the factual underpinnings of the claim are established as a matter of law.

Pippin & Gunn's counsel joined the Beckers in their third motion. The court granted the motion.

Question 26 addressed the issue of the Lozano tract. It asked the jury to find the difference, if any, between the market value of all of Parcel 1 with the Lozano 12.548 acres included and the market value of Parcel 1 without the Lozano acres as of February 15, 1984. The jury found $13,637.79. Stewart Title, in its supplemental motion for judgment, requested that the court render judgment based upon the failure of title to the 12.548 acres, along with the jury's answer to Question 26.

The jury returned a verdict generally favorable to the defendants. However, the court disregarded some of the jury's answers. The judgment declared, in relevant part, that: (1) the Beckers recover $678,-887.69 from Stewart Title, Pippin & Gunn, and Bingham, jointly and severally. In addition to that amount, it declared that the Beckers recover from Stewart Title, severally, $967,945.81; (2)(a) Pippin & Gunn recover $678,887.69 from Bingham; (2)(b) Pippin & Gunn recover a judgment for indemnity from Stewart Title for all sums awarded to the Beckers against Pippin & Gunn in (1) above. Stewart Title was subrogated to the rights of Pippin & Gunn for the sums awarded against Bingham in (2)(a) above to the extent of payments made by Stewart Title pursuant to (2)(b) above; (3) Bingham recover a judgment for indemnity from Stewart Title for all sums awarded to the Beckers against Bingham in (1) above; and (4) Harold Haynes and Four West recover from Stewart Title $42,-000, plus $12,500 to cover the cost of appeals, if any.

By point one-A, Stewart Title asserts that some evidence supports the jury's answers to Questions 1(i), 2(j), 3(j), and 4(i). Alternatively, it argues that even if the evidence

---

1. Mr. Edwards informed the court that the only issue that would go to the jury on that part of this case would say: "What is the value of the Lozano out tract in Parcel 1?"

supports the allegations, the Beckers could not recover under Article 21.21 of the Texas Insurance Code or the DTPA.

Questions one through four asked whether Stewart Title "engage[d] in any false, misleading, or deceptive act or practice that was a producing cause of any damages to . . . ." the Beckers, Bingham, Pippin & Gunn, and Harold Haynes & Four West. Each question instructed the jury to consider whether Stewart Title wrote a title policy or policy of title insurance without making or causing to be made a determination of insurability of title in accordance with sound title underwriting practices. The jury answered "No" to all of these questions. However, the trial court disregarded the answers to Questions 1(i), 2(j), and 4(i).

Stewart Title and the Beckers center their argument on whether a title insurer's violation of Article 9.34 of the Texas Insurance Code gives rise to a private cause of action for damages. In enacting Article 9.34, the Texas Legislature set out several conditions which a title insurer must meet before issuing a title insurance policy. One of these conditions is: "No policy or contract of title insurance shall be written unless . . . (3) there has been made a determination of insurability of title in accordance with sound title underwriting practices. . . ." TEX. INS. CODE ANN. art. 9.34 (Vernon Supp.1996).

■ The Beckers' first argument is that Article 9.34 is enforceable through Article 21.21, Section 16 of the insurance code for the reasons stated in *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129 (Tex. 1988); *Allied Gen. Agency, Inc. v. Moody*, 788 S.W.2d 601 (Tex.App.—Dallas 1990, writ denied),[2] and *GAB Business Servs., Inc. v. Moore*, 829 S.W.2d 345 (Tex.App.—Texarkana 1992, no writ).[3]

Article 21.21, Section 16(a) provides, in relevant part:

> Any person who has been injured by another's engaging in any of the practices declared in Section 4 of this Article or in rules or regulations lawfully adopted by the Board under this Article to be unfair methods of competition and unfair and deceptive acts or practices in the business of insurance or in any practice *defined* by Section 17.46 of the Business & Commerce Code, as amended, as an unlawful deceptive trade practice may maintain an action against the company or companies engaging in such acts or practices.

TEX. INS.CODE ANN. art. 21.21, § 16(a) (Vernon 1981) (emphasis ours).

In *Vail*, Texas Farm Bureau Mutual Insurance Company issued an insurance policy covering the Vails' home. Fire destroyed the home, and Texas Farm refused to pay the Vails' claim. The Vails sued Texas Farm for the full amount of the policy and for damages under the DTPA and Article 21.21, alleging a bad-faith failure to pay the claim. The Vails' pleadings alleged that Texas Farm violated Section 17.50(a)(4)[4] of the DTPA by engag-

---

**2.** In *Moody*, Allied General Agency sold Jerry Moody a policy of comprehensive and collision insurance covering his car. The car was stolen and never recovered. Moody submitted a claim, which was denied. Moody sued Allied, alleging that it breached the insurance contract, knowingly violated the DTPA, knowingly violated article 21.21 of the Texas Insurance Code, and breached a common-law duty of good faith and fair dealing and sought punitive damages. Relying on the Supreme Court's holding in *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129 (Tex.1988), the court concluded that a common-law cause of action can serve as the basis for a violation under section 17.46 of the DTPA or under article 21.21, section 16 of the insurance code.

**3.** In *Moore*, GAB, an insurance adjuster, denied workers' compensation benefits to Sherry Moore. She sued GAB, alleging that it did not act in good faith and that it violated portions of the

insurance code and the DTPA in handling her claim. After a jury trial, the court entered judgment against GAB. The appellate court affirmed the judgment and held that an insurer's lack of good faith in processing a claim is an unfair or deceptive act and can serve as the basis of a cause of action under the DTPA.

**4.** Section 17.50(a)(4) provides:

(a) A consumer may maintain an action where any of the following constitute a producing cause of actual damages:

   \*    \*    \*    \*    \*    \*

(4) the use or employment by any person of an act or practice in violation of Article 21.21, Texas Insurance Code, as amended, or rules or regulation issued by the State Board of Insurance under Article 21.21, Texas Insurance Code, as amended.

TEX. BUS. & COM.CODE ANN. § 17.50(a)(4) (Vernon 1987).

ing in acts that violated Article 21.21 or rules or regulations promulgated pursuant to that article. Their contentions were that Texas Farm engaged in the second and third types of conduct prevented by Article 21.21, Section 16 by (1) engaging in practices declared by a rule or regulation of the State Board of Insurance as unfair or deceptive, and by (2) engaging in acts that constituted an unlisted deceptive trade practice under Section 17.46 of the DTPA.

The Supreme Court held that the Vails stated and proved an action for unfair claims settlement practices under Section 17.50(a)(4) on any of three alternative grounds: (1) by incorporating Article 21.21, Section 16, Board Order 18663, Section 4(a), and the definition of an unfair claims settlement practice as found in the insurance code; (2) by incorporating Article 21.21, Section 16, Board Order 18663, Section 4(b), and the determinations in *Arnold* [5] and *Aranda* [6]; and (3) by incorporating Article 21.21, Section 16 and Section 17.46 of the DTPA.

About six years after *Vail,* the Supreme Court decided *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145 (Tex.1994). In that case, Kathleen Watson was injured in a car wreck. The driver of the other car was an insured under an automobile liability policy issued by Allstate. Watson sued that driver for negligence. She also sued Allstate under Article 21.21, Section 16, for alleged unfair claim settlement practices in failing to try in good faith to effectuate prompt settlement of her claims after liability became reasonably clear, and in denying or unreasonably delaying payment of her claim. She alleged that Allstate's conduct violated Section 17.46 of the DTPA, thereby giving rise to her cause of action under Article 21.21, Section 16. The court stated, in relevant part:

> Art. 21.21, section 16 provides a private cause of action for any practice *defined by* section 17.46 of the DTPA as an unlawful deceptive trade practice. TEX. INS.CODE ANN. art. 21.21, § 16. "Unfair claim settlement practices" is not among the enumerated items defined by section 17.46 as an unlawful deceptive trade practice.

> While section 17.46 may not be a complete list of unlawful deceptive trade practices for purposes of asserting claims under the DTPA, [footnote omitted] art. 21.21 expressly makes actionable those acts or practices that, in fact, are defined in section 17.46 as unlawful deceptive trade practices. Unfair claim settlement practices are not listed and, therefore, they are not actionable under art. 21.21, section 16 of the Insurance Code.

*Watson,* 876 S.W.2d at 149 (emphasis in original). The *Watson* court stated that *Vail* was based upon the court's expressed belief that a special relationship existed between an insured and an insurer. The court said that "*Vail* remains the law as to claims for alleged unfair claim settlement practices brought by insureds against their insurers." *Watson,* 876 S.W.2d at 149.

The *Watson* court, by stating that Article 21.21, Section 16 provides for a private cause of action for any practice *defined by* Section 17.46 as an unlawful deceptive trade practice, modified the court's earlier pronouncement in *Vail,* which said that Article 21.21, Section 16 incorporated any unlisted practice that was determined as false, misleading, or deceptive. *See Hart v. Berko, Inc.,* 881 S.W.2d 502, 508–09 (Tex.App.—El Paso 1994, writ denied) (stating that *Allstate* modified *Vail* in this manner).

In the instant case, Stewart Title's alleged conduct, writing a title policy without making or causing to be made a determination of insurability of title in accordance with sound title underwriting practices, is not one of the false, misleading, or deceptive acts or practices defined by Section 17.46. *See* TEX. BUS. & COMM.CODE ANN. § 17.46 (Vernon 1987 & Supp.1996).

Further, neither the insurance code nor the State Board of Insurance have defined Stewart Title's alleged conduct as unfair or deceptive; and no Texas appellate court has determined that conduct such as that alleged against Stewart Title constitutes an unfair or deceptive act. That being the case, the

---

**5.** *Arnold v. Nat'l County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987).

**6.** *Aranda v. Ins. Co. of N. Am.,* 748 S.W.2d 210, 212–13 (Tex.1988).

Beckers cannot recover under Board Order 18663, Sections 4(a) & (b). We hold that article 9.34 is not enforceable through Article 21.21, Section 16, for the reasons specified in *Vail, Moody, and Moore.*

### Private Statutory Cause of Action

■ The Beckers also argue that a damage action exists to enforce Article 9.34, as a statutory cause of action under that statute, akin to a common-law action for negligence *per se* for violation of a statute. They contend that although Article 9.34 does not create a cause of action, if the legislature designed it to protect a specified class, the courts may fashion a common-law cause of action for violation of the statute. On the other hand, Stewart Title argues that Texas law does not place on a title insurer any duty to the insured in addition to its agreement to insure against title defects. Moreover, the Texas Supreme Court has failed to recognize a private duty to the insured in addition to the duty to insure against title defects. Stewart Title argues that Article 9.34 merely creates an industry standard but does not create a standard of care for purposes of private litigation.

Reviewing the enforcement provisions of the Texas Title Insurance Act [7] (the Act), we note that the legislature entrusted the business of title insurance to the State of Texas. Article 9.01(B) states:

> The Legislature of the State of Texas finds that the business of title insurance, both the direct issuance of policies and the reinsurance of any assumed risks, of every type, shall in all respects be *totally regulated by the State of Texas* so as to provide for the protection of *every consumer and purchaser of a title insurance policy.* It is the express legislative intent that this Chapter 9 accomplish such a result.

TEX. INS.CODE ANN. art. 9.01(B) (Vernon 1981) (emphasis added). Article 9.21(b) gives the State Board of Insurance (the Board) the power to promulgate and enforce rules and regulations prescribing underwriting standards and practices upon which companies are to issue title insurance contracts. In addition, this article empowers the Board to

promulgate and enforce all other rules and regulations which in the Board's discretion are deemed necessary to accomplish the purposes of the Act. *See* TEX. INS.CODE ANN. art. 9.21(b) (Vernon Supp.1996). Article 9.28 provides, in relevant part:

> If any corporation, domestic or foreign, while holding a certificate of authority to transact business in this state, shall fail or refuse to comply with *any of the provisions or requirements of this Chapter,* the Board, upon ascertaining this fact, shall notify such company by actual notice in writing delivered to an executive officer of such company, of his intention to revoke its certificate of authority to transact business in this state at the expiration of thirty (30) days after the mailing of such registered letter, or the date upon which such actual notice is served. If such provisions or requirements are not fully complied with upon the expiration of said thirty (30) days, it shall be the duty of the Board to revoke the certificate of authority of such company . . . .

TEX. INS.CODE ANN. art. 9.28 (Vernon 1981) (emphasis added).

■ We must construe a statute to give effect to the legislative intent. *Harris County Dist. Attorney's Office v. J.T.S.,* 807 S.W.2d 572, 574 (Tex.1991). When the legislature enacts a regulatory statute to protect a class of persons, it intends to create an enforcement scheme that will fully protect that class. *Litton Indus. Prods., Inc. v. Gammage,* 644 S.W.2d 170, 176 (Tex.App.— Houston [14th Dist.] 1982), *aff'd in part, rev'd in part on other grounds,* 668 S.W.2d 319 (Tex.1984). Thus, when the enforcement scheme fails to adequately protect the intended beneficiaries, the courts have a duty to imply a cause of action to effectuate the legislative purposes. *Gammage,* 644 S.W.2d at 176. We may impute an implication to a statute only when it is obvious that the legislature intended the implication, and no other interpretation can be gathered from the statute as written; implications are never permitted if they will add to or contradict the statute. *Williams v. Anderson,* 850 S.W.2d

---

7. *See* TEX. INS.CODE ANN. arts. 9.01–9.59 (Vernon 1981 & Supp.1996).

281, 284 (Tex.App.—Austin 1993, writ denied).

The legislature, by enacting these articles, intended to protect every consumer and purchaser of a title insurance policy. It gave to the State the power to promulgate and enforce rules and regulations prescribing underwriting standards and practices upon which companies are to issue title insurance contracts. Article 9.28 allows the Board to punish a company that does not comply with any of the provisions or requirements of Chapter 9. Since the enforcement scheme adequately protects the intended beneficiaries, we do not have a duty to imply a cause of action to effectuate the legislative purpose. *See Gammage*, 644 S.W.2d at 176. We hold that the legislature did not intend a private cause of action under Article 9.34. We sustain point one-A.

■ By point one-C, Stewart Title asserts that probative evidence supports the jury's answer to Question 20. Similar assertions are made by Pippin & Gunn in points of error fifteen, sixteen, and seventeen, and by Bingham in his third point of error. By their first cross-point of error, the Beckers challenge the factual sufficiency of the evidence to support the jury's answer to Question 20.

Question 20 asked, "By what date should ... [the Beckers] in the exercise of reasonable diligence, have discovered all the false, misleading, or deceptive acts or practices you have found as to each of the following named parties...." The named parties were Stewart Title, Pippin & Gunn, Bingham, and Harold Haynes & Four West. The jury found February 16, 1984 as the date for each party. February 16 was the day after Pippin & Gunn and David Becker closed the sale of the ranch. The trial court disregarded the jury's answers to this question.

A trial court may disregard a jury's answer to a special question only when it has no support in the evidence, or when the question is immaterial. *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex.1994); *C. & R. Transp., Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex.1966). *See* Tex.R. Civ. P. 301 (upon motion and reasonable notice, court may disregard any jury finding on question that has no support in evidence).

When reviewing the granting of a motion to disregard a jury finding, an appellate court applies a legal sufficiency or "no evidence" test. *Edwards v. Hammerly Oaks, Inc.*, 908 S.W.2d 270, 275 (Tex.App.—Houston [1st Dist.] 1995, no writ); *Harris County v. McFerren*, 788 S.W.2d 76, 78 (Tex.App.—Houston [1st Dist.] 1990, writ denied). In deciding a no evidence point, the court may consider only that evidence and reasonable inferences therefrom which, when viewed in their most favorable light, support the jury's verdict, and reject all contrary evidence. *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex.1987). If any evidence of probative force exists to support the jury's finding, we must uphold the finding, and the trial court errs in disregarding the verdict. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Edwards*, 908 S.W.2d at 275.

In reviewing a factual sufficiency point, a court of appeals must weigh *all* of the evidence in the record. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996); *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980). A court may overturn findings only if they are so against the great weight and preponderance of the evidence that they are clearly wrong and unjust. *Ortiz*, 917 S.W.2d at 772; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). In *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986), the court said that a court of appeals must also "clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust." *Pool*, 715 S.W.2d at 635.

Section 17.565 of the Texas Business & Commerce Code provides that a party must bring a DTPA action "within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice...." Tex. Bus. & Comm.Code Ann. § 17.565 (Vernon 1987).

The Beckers filed suit on October 19, 1989, alleging these title defects: 1) by warranty deed dated May 22, 1974, Bingham had con-

veyed to Pete Lozano a portion of the ranch; 2) by deed dated October 30, 1974, Naylor Ranch Company and others had conveyed to Lozano certain land included in the deed from Bingham to Pippin & Gunn and in the deed from Pippin & Gunn to Becker; and 3) an additional part of the ranch, purportedly conveyed by Bingham to Pippin & Gunn and by Pippin & Gunn to Becker, was never owned by Bingham. Thus, Becker received no title to Parcel 2 and defective title to Parcel 1. They further alleged that a letter from Walter Wolff, Jr., received about June 30, 1989, was the first time they knew, or in the exercise of reasonable care, should have known of the facts giving rise to their claims. Therefore, the discovery rule prevented limitations from running on each claim.

### Discovery Rule

█ The discovery rule operates to toll the running of the limitations period until the time that the plaintiff discovers, or through the exercise of reasonable care and diligence should discover, the nature of the injury. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990); *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988). In *Hoover v. Gregory,* 835 S.W.2d 668 (Tex.App.—Dallas 1992, writ denied), the court stated:

> It is not necessary that a party should know the details of the evidence by which to establish his cause of action; it is enough that he knows that a cause of action exists in his favor, and when he has this knowledge it is his own fault if he does not avail himself of those means which the law provides for prosecuting or preserving his claim.

*Hoover,* 835 S.W.2d at 671–72 (citing *Citizens State Bank v. Shapiro,* 575 S.W.2d 375, 385 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.)). The discovery rule expressly mandates the party to exercise reasonable diligence to discover facts of negligence or omission. *Willis,* 760 S.W.2d at 646 n. 2; *Bell v. Showa Denko K.K.,* 899 S.W.2d 749, 754 (Tex.App.—Amarillo 1995, writ denied).

█ Due to the discovery rule's requirement of reasonable diligence, the tolling of the limitations statute by the rule ends when the person claiming the benefits of the rule acquires knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action. This is because the knowledge of these matters is, in the law, equal to knowledge of the cause of action itself for limitations purposes. *Bell,* 899 S.W.2d at 754. *See Borderlon v. Peck,* 661 S.W.2d 907, 909 (Tex.1983).[8]

█ Generally, when an attorney acquires knowledge of facts during the course of his or her employment that relate to the subject matter of his or her employment, this knowledge is imputable to the client. *Canutillo Indep. Sch. Dist. v. Kennedy,* 673 S.W.2d 407, 409 (Tex.App.—El Paso 1984, writ ref'd n.r.e.).

In this case, the evidence showed that on May 22, 1974, Bingham executed a deed conveying 8.82 acres of land to Pete Lozano. This property was north of the Frio River. Lozano and Bingham built a fence around the tract. Around November 22, 1983, Bingham met Becker at the ranch. Bingham knew Becker was interested in buying the property. In a deposition excerpt[9] read to

---

**8.** In *Borderlon,* Dr. Peck operated on Catherine Borderlon and left part of a needle in her abdomen. She testified in deposition that he did not inform her of his decision to leave the needle there. He last treated her on February 21, 1979. Four days later, she had x-rays and was informed that a foreign object was in her abdomen. On March 2, 1979, she had surgery during which the needle was discovered and removed. She filed a medical-malpractice suit on February 27, 1981, six days after the two-year limitation period had run. Dr. Peck moved for summary judgment based on limitations, and Borderlon responded that he fraudulently concealed from her the fact he left the needle inside her. The trial court granted summary judgment for Dr. Peck. The supreme court reversed the judgment and said:

> The estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action. Knowledge of such facts is in law equivalent to knowledge of the cause of action.

*Borderlon,* 661 S.W.2d at 909.

**9.** As read by Stewart Titles' counsel, the excerpt stated:

the jury, Bingham stated that he informed Becker about the history of the fence and the Lozano transaction. At trial, Stewart Titles' counsel, referring to the deposition, asked Bingham, "[A]nd you told me then that at least in 1983 when Mr. Becker was out there looking at this transaction [sic] that you told him about this Lozano fence and the transaction involving Mr. Lozano?" He responded that he was "almost sure" that he did.

Attorney Robert Thorpe represented Pippin & Gunn when they bought the ranch and when they sold it to Becker. Thorpe indicated that Parcel 2 was covered by a special warranty deed due to problems with the property at the time Bingham sold it to Pippin & Gunn. At that time, Thorpe and Bingham's attorney, Bill Moeller, decided that Bingham would convey the property to Pippin & Gunn in two parcels because a question existed regarding the title to the land south of the Frio River. He and Moeller wanted to separate the land south of the Frio (Parcel 2) from the land that was conveyed north of the Frio (Parcel 1). Thorpe said that the question was prompted by "some of the descriptions that we were looking at...."

Becker retained attorney Ronald Chachere to represent him in the purchase of the ranch. Chachere's involvement began as early as December 1983. His job was to facilitate the closing of the transaction, that is, to review and approve the closing documents. Becker was "sure" he and Chachere discussed the property being purchased. Becker said that Chachere "had a contract to look at." Thorpe and Chachere discussed the difference between the special warranty on Parcel 2 and the general warranty on Parcel 1. Thorpe discussed his concerns regarding Parcel 2 and prepared a closing

Counsel: "You ... told him [Becker] that ... you built the fence relating to the Lozano transaction?"
And your answer was "Right." Is that correct?
Bingham: "Uh-huh."
Counsel: I said, "Okay. But Mr. Becker said 'What's that' and you told him about the history of the fence and the Lozano transaction?"
And your answer was "Yes."
And that would have been in 1983, wouldn't it?

binder concerning the Bingham to Pippin & Gunn transaction. Harold Haynes gave the documents to Becker shortly after he became interested in buying the ranch, and Becker studied them several times. He reviewed the deed, the survey, and the title policy. Thorpe sent a complete set of documents to Chachere who, according to Thorpe, was fully apprised of the reasons for specifying Tracts 1 and 2.

John West, president of McMullen County Title Company,[10] assumed the responsibilities relating to the Pippin & Gunn to Becker transaction. West did not find a recorded deed giving Bingham title to Parcel 2. The Beckers' counsel asked West whether he had informed anyone of his discovery that Bingham did not own Parcel 2. He answered, "No, sir, I told them he could have owned it by his fences and things he did ... on the ground. He could have gotten limitation title." West testified that he would have informed the sellers' counsel, Robert Thorpe; and that he was absolutely sure he informed the parties. West further testified that he told Stellene Dickinson[11] that he would not insure Tract 2 (Parcel 2), and that he was sure he had communicated that to the "other parties."

In May 1989, Becker was at the ranch using a bulldozer to build a sendero, or road, along the Frio. The construction destroyed and damaged numerous trees. From June 4, 1989 to June 23, 1989, he was on vacation. During that time, Leonard Hoskins was building Becker a fence on the ranch. Becker testified that Hoskins had called him and said that Pete Lozano had advised him that "that was his [Lozano's] land and we had no right to be out there building a fence and to get off." Becker indicated that at this time

Bingham: Yeah....

10. McMullen County Title Company bought the assets of McMullen County Abstract Company. The ownership change occurred immediately prior to the sale of the ranch to David Becker.

11. Stellene Dickinson's signature appears on the title insurance policy issued by Stewart Title that covered the Pippin & Gunn to Becker ranch sale. She purportedly signed on behalf of McMullen County Title Company.

he knew that Lozano was claiming an interest in the land. He received a demand letter on June 29, 1989 from Walter Wolff, Jr., counsel for Pete Lozano, Jr., informing him that Lozano owned a parcel of land out of Tracts 64 and 33, section 23, Naylor & Jones Subdivision, LaSalle County. Lozano sued Becker to collect the damages that he allegedly caused on the property (the Lozano suit).[12] Becker claims he was unaware of the ownership problem until he was sued by Lozano. He also claims that, at closing, no one indicated he was getting any less than the property described in the Earnest–Money Contract.

We conclude that there is sufficient evidence from which a jury might reasonably conclude that by February 16, 1984, in the exercise of reasonable diligence, Becker or his attorney should have discovered the occurrence of any false, misleading, or deceptive acts or practices allegedly committed by Stewart Title, Pippin & Gunn, Bingham, or Haynes and Four West, Inc. Therefore, limitations began to run on February 16, 1984. Since the Beckers did not file suit until 1989, limitations barred their claims against the defendants. We sustain Stewart Title's point one-C, Bingham's third point of error, and Pippin & Gunn's points of error fifteen, sixteen, and seventeen. We overrule the Becker's first cross-point of error.

■ By point two-C, Stewart Title asserts that it should not have to indemnify Bingham because he was not an innocent tort feasor.

■ In Questions 19–1(A), the jury found that Bingham relied upon Stewart Title's information relating to the land or services. In Question 19–3(A), the jury found that he did not know or should have known that the information about the land or services was false or inaccurate. The trial court disregarded both findings. Stewart Title asserts that since the court found that Bingham

knew or should have known that the information about the disputed land was false, it implicitly found that Bingham was not an innocent tort feasor. In Texas, only innocent tort feasors are entitled to extracontractual indemnity. *See Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 819–20 (Tex.1984);[13] *B & B Auto Supply v. Central Freight Lines, Inc.*, 603 S.W.2d 814, 817 (Tex.1980) (holding that common-law right of indemnity is no longer available between joint tort-feasors in negligence case).

We previously determined that limitations barred the Beckers' DTPA suit against Stewart Title and Bingham. That being the case, Stewart Title's argument is moot. We overrule point two-C.

■ By points three and four, Stewart Title challenges the trial court's award of damages to Harold Haynes & Four West.

Harold Haynes was a shareholder in Four West[14] and served as its president. Four West was a company that dealt with the purchase and sale of land. In 1981, one of its shareholders, Tommy Smothers, heard that Bingham wanted to sell a tract of land. Haynes, Smothers, and Joe Pritchett viewed the property and decided to buy it. Haynes testified that "we bought the land in Four West, Inc. and/or assigns." He said that this meant that they had the right to assign their interest in the contract to another buyer. Four West assigned the contract to Pippin & Gunn. Stewart Title issued a title insurance policy insuring the property. At trial, Robert Anderson, counsel for Haynes and Four West, asked Haynes, "Did you pay part of the price of the—part of the title policy?" He replied, "Yes, sir, we paid our prorata share. . . ." Stewart Title's counsel, referring to Stewart Title's title policy to Pippin & Gunn, asked Haynes, "You're not an insured under that policy, are you?" He replied, "[O]ur name doesn't appear on the title poli-

---

12. The Lozano suit was settled.

13. The *Bonniwell* court stated that in *B & B Auto Supply v. Central Freight Lines, Inc.*, 603 S.W.2d 814, 816–17 (Tex.1980), "we recognized the survival of common law indemnity with respect to liability of a purely vicarious nature. An analogous indemnity right survives in products liability cases to protect the innocent retailer in the

chain of distribution. This is all that remains of the common law doctrine of indemnity." *Bonniwell*, 663 S.W.2d at 819–20.

14. The shareholders in Four West were Harold Haynes, Tommy Smothers, Joe Pritchett, and David Meyers.

cy ... We've paid our prorata share of the policy." Counsel asked if that was "part of the deal to kind of get it closed?" Haynes replied that "that was the understanding." He added "[W]e were making a profit on the transaction. We felt like it was our obligation to pay our prorata share of the title policy."

After the deal with Pippin & Gunn closed, Haynes became aware of Becker's interest in buying a hunting place. He called Pippin & Gunn to find out whether they were interesting in selling their property. Pippin informed Haynes that they would consider selling and allowed Haynes to show Becker the property. Haynes testified that as a result, "we ended up drawing a contract for ... [Becker] to purchase the property."

Attorney Robert Anderson read to the jury a stipulation regarding his attorney's fees. In relevant part, he incurred $20,-541.41 before trying this case. He said that a reasonable charge for his services during trial was $1,000 per day and that a reasonable charge for an appeal to the court of appeals was $7,500. If the case was appealed to the supreme court, the "first step" is a $2,500 charge, and the "second step" is an additional $2,500 charge.

The modified final judgment awarded Harold Haynes and Four West judgment against Stewart Title for $42,000 in attorney's fees, plus an additional $7,500 if any party perfected an appeal involving Haynes, Four West, or both in the Texas Court of Appeals. It awarded an additional $2,500 if any party filed an application for writ of error involving Haynes, Four West, or both in the Texas Supreme Court, plus an additional $2,500 if application was granted.

On appeal, Haynes and Four West assert that despite their requests, Stewart Title refused to defend them. They claim that they are consumers of the title insurance provided by Stewart Title with respect to both the original sale to Pippin & Gunn and the subsequent sale to Becker. They contend that the conclusive evidence established that Harold Haynes was the realtor representing the various parties in the transaction and that they are therefore entitled to judgment based upon indemnity, the Texas Insurance Code,

the DTPA, the common law, and the trial court's direct-liability findings.

### Analysis

In Texas, a party may not recover attorneys fees from an opposing party unless the recovery is provided for by statute or by contract between the parties. *The Travelers Indem. Co. of Conn. v. Mayfield,* 39 Tex.Sup. Ct.J. 678, 680, 923 S.W.2d 590, 592 (Tex.1996) (orig.proceeding).

■ An insurance company's obligation to defend or pay a judgment is based upon the contractual liability assumed by its policy. *U.S. Fidelity & Guar. Co. v. Baldwin Motor Co.,* 34 S.W.2d 815, 819 (Tex. Comm'n App.1931, judgm't adopted); *Wheelways Ins. Co. v. Hodges,* 872 S.W.2d 776, 786 (Tex. App.—Texarkana 1994, no writ).

In this case, both title insurance policies stated, in relevant part:

> The Company [Stewart Title] ... shall, except as hereinafter stated, at its own cost defend the insured in every action or proceeding on any claim against, or right to the estate or interest in the land, or any part thereof, adverse to the title to the estate or interest in the land as hereby guaranteed....

Stewart Title did not insure Haynes or Four West in either of the two title insurance policies. Since Stewart Title did not contract to defend them, it had no duty to defend. *See Baldwin Motor Co.,* 34 S.W.2d at 819; *Wheelways Ins. Co.,* 872 S.W.2d at 786. Further, there is no statute which authorizes recovery of attorneys fees under the circumstances of this case.

■ Regarding indemnity, Question 18 asked the jury if any of the listed parties engaged in any false, misleading or deceptive act or practice which was a producing cause of damages to the Beckers. By its answer to Question 18–2, the jury found that Harold Haynes or Four West represented that the land or services had or would have characteristics, uses, quantities, or benefits which they did not have. By its answers to Questions 19–1(C) & 19–3(C), the jury found that Harold Haynes & Four West did not rely upon

the information relating to the land or services provided by Stewart Title and that Harold Haynes & Four West did know or should have known that the information relating to the land or services was false or inaccurate. The jury's answers to these questions show that Harold Haynes and Four West were not innocent tort feasors. That being the case, they are not entitled to indemnity. *See Bonniwell,* 663 S.W.2d at 819–20; *B & B Auto Supply,* 603 S.W.2d at 817.

Concerning the motions for instructed verdict, after the parties closed, several parties argued their motions for instructed verdict. The court ruled on their motions, but it did not state that Stewart Title had a duty to defend Haynes or Four West. We sustain points three and four.

By point seven, Stewart Title challenges the legal sufficiency of the evidence to support the jury's answer to Question 27. By point eight, it asserts that the court erred in submitting this question to the jury. By their second cross-point, the Beckers assert that the court erred in its calculation of attorneys fees based on the jury's answer to this question.

Question 27 asked, "What is a reasonable fee for necessary services of the Beckers' attorneys in this case, stated as a percentage of the Beckers' recovery?" The jury answered 33 1/3 percent. The prefatory language based the award upon affirmative findings of DTPA and Texas Insurance Code violations. We have held that the Beckers cannot recover for these claims. Therefore, we need not address the appropriateness of the amount of fees awarded. *See State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 437 (Tex.1995).[15] We sustain points seven and eight and overrule the Beckers' second cross-point of error.

By point nine, Stewart Title asserts that the trial court erred in admitting evidence relating to the alleged failure of title to the Gentelini tract. Stewart Title claims this evidence was not supported by the pleadings and was therefore immaterial. Pippin & Gunn raise this complaint in their eighteenth point of error.

Stewart Title contends that the Beckers' pleadings did not allege a title defect regarding the Gentelini tract. However, over its objections, the court admitted testimony pertaining to this tract. Stewart Title argues that the jury considered this testimony when it answered Question 22.

The damage award under Question 22 was based upon affirmative findings of DTPA and Texas Insurance Code violations. We have held that the Beckers cannot recover for these claims. Therefore, we need not address the issue of whether the trial court erred in admitting evidence relating to the Gentelini tract. We overrule point nine and Pippin & Gunn's point eighteen.

Due to our disposition of these points, we need not address Stewart Title's remaining points of error. TEX.R.APP. P. 90(a).

### Pippin & Gunn's Points of Error

By points one through six, Pippin & Gunn complain about the Beckers' DTPA claim. By points seven through fourteen, they complain about Question 22, the question on damages. This question was specifically conditioned upon an affirmative answer to any one of Questions 1, 5A, 9A, or any part of 18. Questions 1 and 5A related to Stewart Title's liability to the Beckers under the DTPA. Question 9A related to Stewart Title's liability to the Beckers under Section 9.34 of the Texas Insurance Code. Question 18 related to the liability of Bingham, Pippin & Gunn, or Harold Haynes or Four West to the Beckers under the DTPA. We have held that limitations barred the Beckers' DTPA claims and that they do not have a private cause of action under Section 9.34. Therefore, Pippin & Gunn's points of error are not dispositive

---

**15.** In *Beaston,* the supreme court stated that to obtain an award of attorneys fees under the DTPA or Section 38.001 of the Civil Practice & Remedies Code, a party must (1) prevail on a cause of action for which attorneys fees are recoverable, and (2) recover damages. The court said that since the fee-shifting provision of Article 21.21 of the Texas Insurance Code echoes the words of the DTPA and Section 38.001 which provide for awarding attorneys fees, it held that a party must satisfy the same two requirements to recover attorneys fees under Article 21.21. *Beaston,* 907 S.W.2d at 437.

of the appeal, and we do not need to address them. TEX.R.APP. P. 90(a).

### Bingham's Points of Error

Bingham challenges the trial court's judgment by four points of error and two reply points. Because we have previously determined that limitations barred the Beckers' misrepresentation claims against all the defendants, and accordingly there is no need for indemnity between the parties, Bingham's complaint concerning indemnity and attorneys fees based thereon are not dispositive to this appeal. TEX.R.APP. P. 90(a).

We Reverse the trial court's judgment in its entirety and Render judgment against Stewart Title that the Beckers recover $13,637.79, based on the contractual claims.