**SERVICE FINANCE, Appellant,**

v.

**ADRIATIC INSURANCE COMPANY, et al., Appellees.**

**No. 10–99–027–CV.**

Court of Appeals of Texas, Waco.

May 2, 2001.

Leonard A. Epstein, J. Kent Davenport, Newman, Davenport & Epstein, P.C., Sallas, for appellant.

David G. Tekell, Malesovas, Martin & Tekell, L.L.P., Waco, for Adriatic Insurance Company.

Riley L. Burnett, Jr., Johnson, Burnett & Chang, L.L.P., Houston, for American Recreational Markets.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

DAVIS, Chief Justice.

Service Finance filed suit against Adriatic Insurance Company and its surplus lines agent American Recreational Markets, Inc. (collectively, "Appellees") to recover unearned premiums and premium receipts taxes on three cancelled insurance policies for which Service Finance had provided premium financing. Service Finance alleges breach of express or implied contract and violation of article 24.17 of the Insurance Code. Service Finance also seeks a declaration of Appellees' liability under the Uniform Declaratory Judgments Act. The parties tried the matter before the court, which rendered judgment that Service Finance take nothing by its suit.

Service Finance presents eleven issues on appeal. In several of these issues, Service Finance contends that it established as a matter of law that:

- it provided notice to Adriatic of its premium finance agreements on all of the policies at issue;
- Appellees violated article 24.17 of the Insurance Code;
- it had contracts with Appellees;
- the policyholders in this case had contracts with Appellee American Recreational Markets ("ARM");
- all conditions precedent to any refund under the policies had been satisfied;
- Appellees breached their contractual duties to refund the unearned premiums due under the policies; and
- it is entitled to prejudgment interest and attorney's fees.

In most of these issues, Service Finance also contends that the court's findings to the contrary are against the great weight and preponderance of the evidence.

In other issues, Service Finance contends that the court erred in concluding: that Adriatic had no obligation to directly refund any unearned premiums; that article 24.17 of the Insurance Code does not create a separate cause of action; that the lack of an express contract between ARM and the policyholders is irrelevant because ARM was Adriatic's agent; that the two-year statute of limitations applies to a suit for a refund of unearned premiums; and

that this is a conversion case rather than a breach-of-contract case.

## BACKGROUND

Adriatic is a Louisiana insurance company not licensed to sell insurance in Texas. Adriatic sells insurance policies in Texas through surplus lines agents such as Appellee American Recreational Markets ("ARM"). During the pertinent time period, George and Brenda Brown operated an unincorporated premium finance company under the name Service Finance.

### THE WALLSTEN TRANSACTION

On September 26, 1985, Leonard Wallsten applied with Colonial Insurance Agency for the purchase of an Adriatic policy through Capitol of Texas Surplus Lines ("COT"). Service Finance provided financing for the premiums. Wallsten's premium finance agreement gives Service Finance "a security interest in unearned premiums and loss payments on the insurance policy being purchased." It also contains the following power of attorney:

### POWER OF ATTORNEY—NOTICE TO INSURER

This is to inform you and to certify that the premium for this policy(ies) has been financed and to further state that in recognition of the several possibilities which might cause my inability or failure to pay any insurance premium installment when due, I do irrevocably make, constitute, and appoint *SERVICE FINANCE, 3333 NORTH 19TH STREET, P.O. BOX 5398, WACO, TEXAS 76708* (hereinafter called LENDER) and its assigns my true and lawful attorney for me to cancel and collect all return premiums on the above listed insurance policy(ies); and Lender and its assigns is further authorized and empowered to execute all necessary written instruments, lost policy releases, and notices in connection therewith and to do whatever is necessary in the cancellation of such policy(ies).

Service Finance received the finance agreement from Colonial on October 8 and sent a $1,275.00 check to COT on October 10 to pay the premiums and taxes for the Wallsten policy. COT forwarded these payments and Wallsten's policy application to ARM.

Service Finance sent a cancellation notice to Colonial and COT "effective" January 13, 1986 advising that Wallsten was delinquent on his premium installments and asking that his policy be cancelled in accordance with the power of attorney contained in the premium finance agreement. Adriatic issued a notice of cancellation on April 25 showing May 7 to be the effective date of cancellation. ARM sent a copy of this notice to Service Finance together with a refund worksheet indicating the pro rata and short-rate refunds which would apply to the Wallsten policy. The worksheet indicates the pro rata refund to be $783.02 and the short-rate refund to be $624.13.[1]

Adriatic credited ARM's account current with $754.00 due to the cancellation.[2] ARM issued a refund check in the amount

---

1. The refund worksheet breaks the pro rata refund down into $754.00 for premiums and $29.02 for taxes. The short-rate refund is $601.00 for premiums and $23.13 for taxes.

2. Adriatic did not credit ARM with the portion of the refund attributable to unearned premium receipts taxes because ARM forwarded the applicable taxes directly to the State. *See* Act of April 27, 1967, 60th Leg., R.S., ch. 185, § 2, 1967 Tex. Gen. Laws 400, 412–13 (amended 1989) (current version at TEX. INS.CODE ANN. art. 1.14–2, § 12(a) (Vernon Supp.2001)).

of $603.20 to Service Finance on May 30.[3] Service Finance corresponded with ARM and Adriatic on several occasions thereafter asserting that it was entitled to an additional refund. Service Finance contends that it is entitled to the pro rata refund of $783.02 rather than the $603.20 refund which it received.

### THE DAVIS TRANSACTIONS

On November 15, 1985, J.R. Davis signed a premium finance agreement identical to Wallsten's with Hargrave Insurance Agency. The total premium on this policy was $9,128.42, of which Davis financed $5,978.00. The agreement grants the same security interest and power of attorney to Service Finance. Service Finance received the Davis agreement on December 9 and sent a $5,978.00 check to COT for premiums and taxes on that same date.

Davis signed a second premium finance agreement with Hargrave on December 9. This contract has terms identical to those in the agreements described above. Davis financed $5,539.00 of his total premium of $8,217.65 in this contract. Service Finance received the December 9 contract on December 30 and sent a $5,539.00 check to COT for premiums and taxes on that same date.

Adriatic sent a cancellation notice to Davis and COT on January 26, 1986 cancelling Adriatic policy number CX00868 effective February 9. Brenda Brown testified that Service Finance received a copy of this notice on March 6. This notice contains a refund worksheet indicating a pro rata refund of $12,498.34 and a short rate refund of $10,650.85.[4]

Service Finance sent a cancellation notice to Hargrave, COT, ARM, and Adriatic "effective" April 4 informing them that Davis was delinquent on his premium installments under the December 9 contract and requesting cancellation of policy number CX00868. Service Finance sent a second cancellation notice to Hargrave, COT, ARM, and Adriatic "effective" April 11 informing them that Davis was delinquent on his premium installments under the November 15 contract and again requesting cancellation of policy number CX00868.[5]

Service Finance sent letters to ARM on April 17, 1986 and to Adriatic on January 6, 1987 requesting a cancellation refund on the Davis contracts. Adriatic returned the unearned premiums by crediting ARM's account current with $12,035.00. ARM has not refunded any of this money to Service Finance, which contends that it is entitled to the pro rata refund of $12,498.34.

### THE BLANCHARD TRANSACTION

Eddie Blanchard signed an identical premium finance contract with insurance agent Carl D. Baker on February 24, 1986. Like the other contracts, Blanchard's gives Service Finance a security interest in unearned premiums and a power of attorney. Service Finance received the Blanchard

---

3. It is unclear why ARM issued a refund of $603.20 rather than $601.00.

4. The worksheet breaks the pro rata refund down into $12,035.00 for premiums and $463.34 for taxes. The short-rate refund is $10,256.00 for premiums and $394.85 for taxes. These totals exceed the amount financed because Davis did not finance the entirety of the premiums ($17,346.07) paid.

5. The record reflects that the second transaction was treated as an endorsement to Adriatic policy number CX00868. Brenda Brown explained that, even though Adriatic had already cancelled the policy, Service Finance mailed these notices to protect its security interests.

contract on March 6 and sent a $310.00 check directly to Adriatic for premiums and taxes on the same date with notice of the premium finance contract. Adriatic returned the check and informed Service Finance that it should remit payment to ARM, which it did on March 26.

Service Finance sent a cancellation notice to Baker and Adriatic "effective" July 11, 1986 informing them that Blanchard was delinquent on his premium installments and requesting cancellation of the policy. Adriatic issued a notice of cancellation on July 28 showing August 9 to be the effective date of cancellation. ARM sent Service Finance a $198.00 refund check dated August 29. Service Finance notified Adriatic and ARM by letter dated October 6 that it believed the premium refund was calculated incorrectly and asked that they provide their "figures" for determining the amount of the refund. Adriatic responded in an October 14 letter that the short-rate refund of $198.00 "plus applicable taxes" was applicable to the Blanchard policy. Adriatic included a refund worksheet indicating a pro rata refund of $254.43 and a short-rate refund of $205.62.[6] Service Finance contends that it is entitled to a refund of the $7.62 in unearned premium receipts taxes in addition to the $198.00 refund it has already received.

## STANDARD OF REVIEW

■ On an appeal from a judgment rendered in a bench trial, we review the court's findings of fact in the same manner as jury findings. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Lucas v. Texas Dep't of Protective & Regulatory Servs.*, 949 S.W.2d 500, 502 (Tex.App.—Waco 1997, pet. denied). When an appellant asserts that there is no evidence to support an adverse finding on which the appellant had the burden of proof, we construe the issue as an assertion that the contrary was established as a matter of law. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *La Grange v. Nueces County*, 989 S.W.2d 96, 99–100 (Tex.App.—Corpus Christi 1999, pet. denied); *Ex parte Thomas*, 956 S.W.2d 782, 786 n. 5 (Tex.App.—Waco 1997, no pet.). We first search the record for evidence favorable to the finding, disregarding all contrary evidence. *See Sterner*, 767 S.W.2d at 690; *La Grange*, 989 S.W.2d at 100. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law. *Id.*

■ A factual sufficiency challenge to an adverse finding requires us to examine the entire record. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996) (per curiam); *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 503 (Tex.App.—Waco 1997, pet. denied). We will set aside the finding only if it is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Id.*

■ We review the court's conclusions of law *de novo*. *City of Houston v. Kolb*, 982 S.W.2d 949, 952 (Tex.App.—Houston [14th Dist.] 1999, pet. denied); *Hitzelberger*, 948 S.W.2d at 503. We overturn these conclusions only when they are erroneous as a matter of law. *Id.*

## THE NATURE OF SERVICE FINANCE'S CAUSES OF ACTION

Service Finance's second, third, eighth, and ninth issues concern the nature of the

---

**6.** The worksheet breaks the pro rata refund down into $245.00 for premium and $9.43 for taxes. The short-rate refund is $198.00 for premium and $7.62 for taxes.

causes of action it has asserted against Appellees. In the second issue, Service Finance contends that it established as a matter of law that Appellees violated article 24.17. The third issue challenges the trial court's Conclusion of Law No. 2 that article 24.17 does not create a separate cause of action. The eighth issue challenges the court's Conclusion of Law No. 10 that the two-year statute of limitations applies to this case. The ninth issue contests the court's treatment of this case as a conversion case to which a two-year statute of limitations applies.

None of the parties differentiates between the legal basis for an action to recover unearned premiums and the basis for an action to recover the premium receipts taxes which are based on those unearned premiums. Nonetheless, we believe that such actions are distinct and have different bases in the law. Accordingly, we address them separately.

### UNEARNED PREMIUMS

"[O]rdinarily, an insured may not have any part of his premium returned once the risk attaches, even if the premium is in part unearned, unless there is an agreement to that effect." 15 JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 8351 (perm. ed. rev.vol.1985); *accord* 2 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3D § 32.53 (Dec.1995). In addition to policy provisions which often require the refund of unearned premiums upon cancellation, some statutes require such a refund. *See* APPLEMAN, *supra* § 8351 n. 2; RUSS, *supra* § 32.53.

In Texas however, the refund of unearned premiums is largely governed by the terms of individual insurance policies. *See, e.g., Cimarron Ins. Co. v. Southwestern Indem. Co.,* 161 Tex. 516, 518–19, 344 S.W.2d 442, 444 (1961); *Argonaut S.W. Ins. Co. v. Amco Mesh & Wire Co.,* 472 S.W.2d 843, 846–47 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.). The typical policy contains a cancellation clause which provides for a short-rate refund of unearned premiums when the insured cancels the policy or a pro rata refund when the insurer cancels. *Id.*

Premium finance companies are governed by the provisions of chapter 24 of the Insurance Code. *See* TEX. INS.CODE ANN. arts. 24.01–24.22 (Vernon 1981 & Supp.2001). Article [7] 24.17(b) permits a premium finance company to include in the finance contract "a power of attorney enabling the premium finance company to cancel any insurance contract or contracts listed in the agreement. An insurance contract or contracts may not be cancelled by the premium finance company unless the cancellation is effectuated in accordance with this section." *Id.* art. 24.17(b) (Vernon 1981). The version of article 24.22 in effect at the time the premium finance contracts in this case were signed required the premium finance company to "notify the insurer whose premiums [we]re being financed of the existence of such agreement within a reasonable period of time not to exceed 30 days after the date such agreement [wa]s received by the premium finance company." Act of May 31, 1981, 67th Leg., R.S., ch. 718, § 1, 1981 Tex. Gen. Laws 2663, 2663 (amended 1989) (current version at TEX. INS.CODE ANN. art. 24.22 (Vernon Supp.2001)).[8]

---

**7.** The term "article" as used hereinafter refers to an article of the Insurance Code unless otherwise indicated.

**8.** The current version of article 24.22 requires notice only when the premium finance agreement contains an assignment or power of attorney in favor of the premium finance company. *See* TEX. INS.CODE ANN. art. 24.22 (Vernon Supp.2001).

The dispute in this case centers around article 24.17(f) which requires the insurer in certain cases to refund unearned premiums directly to the premium finance company upon cancellation of the policy. *See* Act of May 31, 1981, 67th Leg., R.S., ch. 718, § 2, 1981 Tex. Gen. Laws 2663, 2663 (amended 1989) (current version at TEX. INS.CODE ANN. art. 24.17(f) (Vernon Supp. 2001)) (hereinafter, "TEX. INS.CODE ANN. art. 24.17(f)"). The version of article 24.17(f) applicable to this case provided as follows:

(f) Whenever a financed insurance contract is canceled, and the premium finance agreement contains an assignment or power of attorney for the benefit of the premium finance company, the insurer shall return whatever unearned premiums are due under the insurance contract directly to the premium finance company within 60 days after receipt of a copy of the notice of cancellation from the premium finance company only if such company timely notified the insurer of the existence of the premium finance agreement in accordance with the provisions of Article 24.22 herein. In the event that the premium finance company fails to comply with the provisions of Article 24.22 herein, the insurer may satisfy any legal obligation it has to return the unearned premiums due under the insurance contract to the insurance premium finance company by returning said unearned premiums through the insurance agent or agencies writing the insurance. Provided, however, the insurer may deduct from the unearned premiums returned directly to the premium finance company the amount of unearned commissions due from the agent or agency writing the insurance if the insurer notifies such agent or agency that such unearned commissions should be returned to the premium finance company. The insurer except for the Texas Catastrophe Property Insurance Association, the Texas Automobile Insurance Plan, and the Texas Medical Liability Insurance Underwriting Association shall be liable for the return of unearned commission to the premium finance company if the agent has not returned the same to the premium finance company within 120 days after the agent has been notified of the cancellation.

*Id.*

Title 28 of the Texas Administrative Code contains regulations regarding an insurer's duty to refund unearned premiums directly to a premium finance company upon cancellation of the policy. The version of section 25.504 of that title applicable to this case provided:

It shall be the responsibility of the insurer to pay the entire amount of the unearned premium to be refunded as a result of cancellation of insurance policies to the insurance premium finance company. If the premium finance company notified the insurer of the existence of the premium finance agreement pursuant to the Insurance Code Article 24.22, then the entire amount of any unearned premium owed the insurance premium financing company (insured) shall be paid within 60 days from the date notice of cancellation was received.... The insurer shall return whatever unearned premiums are due under the insurance contract to the premium finance company either directly or through the agent or agency writing the insurance. If the insurance premium finance company does not give notice of the premium finance agreement to the insurer (as provided for by the Insurance Code, Article 24.22), then the total unearned premium refund shall be paid to the premium finance company within 120 days from the effective date of the

cancellation. The canceling company shall pay the entire amount of unearned premium, which includes the portion of the unearned part of the agent's commission, directly to the insurance premium finance company. It shall be the insurer's responsibility to collect from its agent that part of the unearned premium retained by its agent.

9 Tex. Reg. 275–76 (1984), *adopted* 9 Tex. Reg. 2783 (1984) (former 28 Tex. Admin. Code § 25.504) (repealed 1995) (current version at 28 Tex. Admin. Code § 25.10 (West 2000)).

The parties also cite section 25.509 of title 28, which provided:

A premium finance company which enters into a premium finance agreement with an insured to finance an insurance policy or policies shall notify the insurer whose premiums are being financed of the existence of such agreement within a reasonable period of time not to exceed 30 days after the date such agreement is received by the premium finance company. The word "insurer" as used in Insurance Code, Articles 24.17 and 24.22, means the company or other entity formally liable on the insurance risk. It does not mean an insurance agent. Accordingly, notice to an insurance agent or to a managing general insurance agency of the insurer is not notice under the Insurance Code, Article 24.22. If the premium finance company gave notice to the insurer in accordance with the Insurance Code, Article 24.22, the insurer shall, as provided in the Insurance Code, Article 24.17, return whatever unearned premiums are due under the insurance contract directly to

the premium finance company within 60 days. Return of unearned premium through an account current with an agent or agency does not satisfy the insurer's obligation under the Insurance Code, Article 24.17.

11 Tex. Reg. 188 (1986), *adopted* 11 Tex. Reg. 3355 (1986) (former 28 Tex. Admin. Code § 25.509) (repealed 1995) (current version at 28 Tex. Admin. Code § 25.64 (West 2000)).[9]

■ Article 24.17(f) requires an insurer to refund "whatever unearned premiums are due under the insurance contract directly to the premium finance company" upon cancellation of a policy, if the finance company "timely notified the insurer of the existence of the premium finance agreement." Tex. Ins.Code Ann. art. 24.17(f). Service Finance contends that this provision creates a private cause of action for a premium finance company to which an insurer has failed to directly refund any unearned premiums due under a cancelled policy. We disagree.

A reading of chapter 24 of the Insurance Code clearly evinces an intent on the part of the Legislature to regulate and protect the premium finance industry. When the Legislature enacts such a regulatory statute, "it intends to create an enforcement scheme that will fully protect that [industry]." *Stewart Title Guar. Co. v. Becker,* 930 S.W.2d 748, 754 (Tex.App.—Corpus Christi 1996, writ denied); *Cole v. Huntsville Mem. Hosp.,* 920 S.W.2d 364, 372 (Tex.App.—Houston [1st Dist.] 1996, writ denied). "[W]hen the enforcement scheme fails to adequately protect the intended beneficiaries, the courts have a duty to imply a cause of action to effectuate the

9. The State Board of Insurance adopted this regulation to take effect on August 4, 1986, which is after the policies at issue were cancelled. *See* 11 Tex. Reg. 3355 (1986). Nonetheless, the parties all rely on this regulation

for interpretation of the notice requirement of article 24.22. Because of this and because the regulation purports to "merely annunciate the provisions of existing law," we will likewise place some reliance on it.

legislative purposes." *Stewart Title Guar.*, 930 S.W.2d at 754; *accord Cole*, 920 S.W.2d at 372.

■ Article 24.09 authorizes the Department of Insurance to enact such regulations as are necessary to carry out the provisions of chapter 24.[10] TEX. INS.CODE ANN. art. 24.09 (Vernon 1981). Article 24.08 provides criminal and administrative penalties for violations of chapter 24. *Id.* art. 24.08 (Vernon Supp.2001). Because the Legislature has provided criminal and administrative remedies and because a premium finance company's rights under article 24.17(f) arise by virtue of "the insurance contract," we decline to imply a private cause of action for the enforcement of article 24.17. Rather, a cause of action by a premium finance company to recover the refund addressed in article 24.17 sounds in contract.

A typical Texas insurance policy requires the insurer to refund any unearned premiums upon cancellation of the policy. *See, e.g., Cimarron Ins.*, 161 Tex. at 518–19, 344 S.W.2d at 444; *Argonaut S.W. Ins.*, 472 S.W.2d at 846–47. The premium finance agreements in this case each grant Service Finance a security interest in all unearned premiums and a power of attorney "to cancel and collect all return premiums" on the financed policy.

Although a security interest in the refund of unearned premiums under an insurance policy is not governed by the Uniform Commercial Code (the "UCC"), the provisions of the Code provide a helpful analogical framework. *See* TEX. BUS. & COM.CODE ANN. § 9.109(d)(8) (Vernon Supp. 2001).[11] The UCC expressly provides that, upon the debtor's default, the secured party "may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure." TEX. BUS. & COM.CODE ANN. § 9.601(a)(1) (Vernon Supp.2001). While the UCC authorizes a secured party to pursue judicial remedies to enforce its security interest, it does not provide an independent cause of action for the secured party. *See id.* cmt. 6 ("secured party may reduce its claim to judgment or foreclose its interest by any available procedure *outside this Article* under applicable law"). We believe article 24.17 should be interpreted in the same manner.

In a premium finance agreement, the insured grants the finance company a security interest in the refund of any unearned premiums and a power of attorney to collect the unearned premiums directly from the insurer upon cancellation of the policy. As the UCC defines the rights and obligations of the parties to commercial transactions governed therein, article 24.17 defines the rights and obligations of the parties to an insurance transaction in which the premiums have been financed and the insured subsequently defaults on the finance agreement. As the UCC does not give rise to a separate cause of action, we believe article 24.17 does not give rise to a separate cause of action, particularly because the premium finance company can

10. Actually, the statute authorizes the "board" to enact such regulations. TEX. INS. CODE ANN. art. 24.09 (Vernon 1981). Nevertheless, all statutory references to the "board" refer to the present Department of Insurance. *Id.* art. 31.007 (Vernon Supp.2001).

11. Section 9.109(d)(8) of the Business & Commerce Code provides that chapter 9 of the Code does not apply to "a transfer of an interest in or an assignment of a claim under a policy of insurance, other than an assignment by or to a health care provider of a health-care-insurance receivable and any subsequent assignment of the right to payment, but Sections 9.315 and 9.322 apply with respect to proceeds and priorities in proceeds." TEX. BUS. & COM.CODE ANN. § 9.109(d)(8) (Vernon Supp.2001).

adequately protect its security interest by filing suit on the insurance contract.

■ Accordingly, a premium finance company may prevail in a suit to recover a refund of unearned premiums by establishing that: (1) the insurance policy provides for a refund of unearned premiums upon cancellation; (2) the premium finance company has authority to collect the refund; (3) the premium finance company gave timely notice of the financing agreement; (4) the insured defaulted on the premium finance agreement; (5) the premium finance company gave notice of the insured's default and requested cancellation of the policy; and (6) the insurer failed to make the proper refund.

■ Because a premium finance company's suit to recover unearned premiums is a suit on a contract, the four-year statute of limitations applies. *Williams v. Khalaf,* 802 S.W.2d 651, 653 (Tex.1990); *Bates v. Texas State Technical College,* 983 S.W.2d 821, 828 (Tex.App.—Waco 1998, pet. denied); TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(3) (Vernon Supp.2001).

### PREMIUM RECEIPTS TAXES

The version of article 1.14–2, section 12(a) applicable to this case required the agent on a surplus lines insurance policy to collect "a premium receipts tax of 3.85 percent of gross premiums charged for such insurance." Act of April 27, 1967, 60th Leg., R.S., ch. 185, § 2, 1967 Tex. Gen. Laws 400, 412–13 (amended 1989) (current version at TEX. INS.CODE ANN. art. 1.14–2, § 12(a) (Vernon Supp.2001)) (hereinafter, "TEX. INS.CODE ANN. art. 1.14–2, § 12(a)"). A surplus lines agent such as ARM was required to "report, under oath, to the State Board of Insurance within 30 days from the 1st day of January and July

of each year the amount of gross premiums paid for such insurance placed through him in nonlicensed insurers, and . . . pay to the Board the tax provided for by this Article." *Id.*

In 1993, the Legislature amended section 12(a) of the statute to require the surplus lines agent to report and pay these taxes to the Comptroller on the same semi-annual basis. *See* Act of May 30, 1993, 73d Leg., R.S., ch. 685, § 3.07, 1993 Tex. Gen. Laws 2559, 2579–80 (amended 1995). The Legislature also amended section 12(d) to make premium receipts taxes collected under the statute subject to the provisions of subtitles A and B, Title 2 of the Tax Code.[12] *See* Act of May 30, 1993, 73d Leg., R.S., ch. 685, § 3.07, 1993 Tex. Gen. Laws 2559, 2580 (current version at TEX. INS.CODE ANN. art. 1.14–2, § 12(d) (Vernon Supp.2001)).

The version of Article 1.14–2, section 12(b) applicable to this case provides:

All surplus lines premium receipt taxes collected by a surplus lines agent are trust funds in his hands and the property of this state. Such funds shall be maintained by the surplus lines agent in a separate account and shall not be mingled with any other funds, either business or private. Any surplus lines agent who fails or refuses to pay over to the state the surplus lines premium receipts tax at the time required in this section, or who fraudulently withholds or appropriates or otherwise uses such money or any portions thereof belonging to the state is guilty of theft and shall be punished as provided by law for the crime of theft, irrespective of whether any such surplus lines agent has or claims to have any interest in such money so received by him.

---

**12.** These subtitles consist of sections 101.001 to 113.107 of the Tax Code. *See* TEX TAX.CODE ANN. §§ 101.001–113.107 (Vernon 1992 & Supp.2001).

Act of April 27, 1967, 60th Leg., R.S., ch. 185, § 2, 1967 Tex. Gen. Laws 400, 413 (amended 1999) (current version at TEX. INS.CODE ANN. art. 1.14–2, § 12(b) (Vernon Supp.2001)).

Pursuant to its regulatory authority, the State Board of Insurance promulgated title 28, sections 15.24 and 15.25 of the Texas Administrative Code to regulate the collection and administration of premium receipts taxes. According to the version of section 15.24(c)(3) applicable to this case, "Retrospective premium adjustments that require the return of a portion of premium or premium deposit shall be effected by the surplus lines agents through a tax refund as hereinafter set forth." 6 Tex. Reg. 775 (1981) (amended 1991) (current version at 34 TEX. ADMIN. CODE § 3.822 (West 2000)) (hereinafter, "28 TEX. ADMIN. CODE § 15.24(c)(3)"). Section 15.25 requires a surplus lines agent to deposit premium receipts taxes in a separate interest-bearing "premium tax trust account." 6 Tex. Reg. 775 (1981) (amended 1989) (current version at 34 TEX. ADMIN. CODE § 3.823(b)-(f) (West 2000)). The agent can make withdrawals from this account only to: (1) remit to the State the taxes owed; (2) return to the insured any unearned taxes; or (3) remove any excess amounts necessary to keep the account fully insured by the FDIC or FSLIC. *Id.* (current version at 34 TEX. ADMIN. CODE § 3.823(g) (West.2000)).

■ Because the surplus lines agent is the custodian of premium receipts taxes and is required by regulation to refund such premiums to the insured whenever premium adjustments are made, we conclude that a suit for the recovery of such a refund is in the nature of a tax refund suit against the agent. Presently, premium receipts taxes are subject to the provisions of the Tax Code relating to tax collections and taxpayer suits. *See* TEX. INS.CODE ANN. art. 1.14–2, § 12(d); TEX. TAX.CODE ANN. §§ 101.001–113.107 (Vernon 1992 & Supp.2001). Thus, it appears that under the present law a claim for a refund of premium receipts taxes must first be filed with the Comptroller under the provisions of section 111.104 of that code. *See* TEX. TAX.CODE ANN. § 111.104 (Vernon Supp. 2001); *see also Fleming Foods of Tex., Inc. v. Rylander,* 6 S.W.3d 278, 286 (Tex. 1999).[13]

■ When the State provides an administrative remedy, a plaintiff must fully utilize this remedy before he can file suit. *See Cornyn v. County of Hill,* 10 S.W.3d 424, 428 (Tex.App.—Waco 2000, no pet.). The failure to do so deprives a trial court of subject matter jurisdiction, except under exceptional circumstances not applicable to this case. *See Essenburg v. Dallas County,* 988 S.W.2d 188, 189 (Tex.1998) (per curiam); *Garcia–Marroquin v. Nueces County Bail Bond Bd.,* 1 S.W.3d 366, 375 (Tex.App.—Corpus Christi 1999, no pet.); *Gibson v. Waco Indep. Sch. Dist.,* 971 S.W.2d 199, 200 (Tex.App.—Waco 1998), *rev'd on other grounds,* 22 S.W.3d 849 (Tex.2000). Service Finance does not allege in its trial pleadings that it exhausted the administrative remedies presently available under the Tax Code, nor did it present any evidence that it had done so. Thus, if its tax refund suit is subject to the exhaustion-of-remedies requirement, then the trial court did not have jurisdiction to consider it. *Id.*

■ A statutory amendment does not affect any remedy which accrued before the amendment and such remedy may be

---

**13.** The Court specifically held that a taxpayer which pays taxes through a third party rather than directly to the State can nevertheless sue the Comptroller for a tax refund. *See Fleming Foods of Tex., Inc. v. Rylander,* 6 S.W.3d 278, 286 (Tex.1999).

enforced "as if the statute had not been ... amended." TEX. GOV.CODE ANN. § 311.031(a)(2), (4) (Vernon 1998). In this case, Service Finance's right to a refund of unearned premium receipts taxes accrued, if at all, when the policies were cancelled in 1986. Thus, Service Finance can pursue this refund "as if the statute had not been ... amended" to require that such claims be first filed with the Comptroller under the pertinent provisions of the Tax Code. *Id.*

■ Because Service Finance's tax refund claim is subject to the law as it existed before the 1993 amendments, the claim is subject to the residual four-year statute of limitations. *See AT & T Corp. v. Rylander*, 2 S.W.3d 546, 553 (Tex. App.—Austin 1999, pet. denied); TEX. CIV. PRAC. & REM.CODE ANN. § 16.051 (Vernon 1997). Section 16.051 requires actions to be brought within four years "after the day the cause of action accrues." TEX. CIV. PRAC. & REM.CODE ANN. § 16.051. In *AT & T*, the Austin Court stated without supporting authorities that a "cause of action for a tax refund generally accrues when the tax becomes due," even under the residual limitations statute. *AT & T*, 2 S.W.3d at 553. Apparently, the Court based this observation on its prior decisions construing pertinent provisions of the Tax Code. *See, e.g., Sharp v. IBM Corp.*, 927 S.W.2d 790, 792 (Tex.App.—Austin 1996, writ denied); *Sharp v. AMSCO Steel Co.*, 893 S.W.2d 742, 744 (Tex. App.—Austin 1995, writ denied). However, we have determined that the Tax Code does not apply to Service Finance's claim. Accordingly, we look to the common law to determine when its cause of action accrued for purposes of the residual limitations statute. *See KPMG Peat Marwick v.*

*Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex.1999).

■ Generally, "a cause of action accrues when a wrongful act causes some legal injury." *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex.1997) (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996)). The statutes and regulations do not specify when a surplus lines insurance agent must refund unearned premium receipts taxes. We need not decide that issue in this case, however, because Adriatic cancelled all the policies at issue less than four years before Service Finance filed this suit.[14] Service Finance's right to a refund of the unearned premium receipts taxes in this case could not have begun to accrue until after Adriatic cancelled the policies. Accordingly, limitations does not bar the portion of its suit seeking tax refunds.

### SUMMARY

A premium finance company's suit to recover unearned premiums is a suit on a contract subject to a four-year statute of limitations. A suit to collect unearned premium receipts taxes is a tax refund suit. Because Service Finance's refund claim is subject to pre 1993 law, the residual four-year limitations period applies. Service Finance filed suit within four years after its causes of action accrued. Thus, its suit is not barred by limitations. Accordingly, we sustain Service Finance's eighth and ninth issues. Because we have concluded that article 24.17 does not create a separate cause of action, we overrule Service Finance's second and third issues.

### POLICY PROVISION FOR REFUND OF UNEARNED PREMIUMS

■ Service Finance alleges in its tenth issue that there is no evidence to

---

14. Establishing precisely when Service Finance's cause of action accrued also seems unnecessary because it is highly unlikely that another such claim will be asserted that does not come within the limitations scheme of the Tax Code.

support the court's Finding of Fact No. 31 that it failed to prove the relevant terms of the policies or Finding of Fact No. 32 that it failed to prove that all conditions precedent to any refund under the policies had been satisfied. Service Finance also claims that these findings are contrary to the great weight and preponderance of the evidence. Service Finance's tenth issue likewise challenges the court's Conclusion of Law No. 6 that Service Finance cannot recover under the policies because it failed to introduce in evidence all the terms of the policies. We first review the record for evidence supporting these findings. *See Sterner,* 767 S.W.2d at 690; *La Grange,* 989 S.W.2d at 100.

■■■■■■ Although Service Finance did not introduce the policies themselves into evidence, a plaintiff who was not a party to the original insurance contract need not introduce the entire policy in evidence to prove up the terms of the contract. *See Paragon Sales Co. v. New Hampshire Ins. Co.,* 774 S.W.2d 659, 661 (Tex.1989) (citing *McConnell Constr. Co. v. Insurance Co.,* 428 S.W.2d 659, 662 (Tex.1968)); *accord Texas Farmers Ins. Co. v. Murphy,* 996 S.W.2d 873, 879 (Tex.1999). Such a plaintiff need only prove those terms of the policy which allow its recovery. *Id.* The insurer must plead and prove as affirmative defenses any provisions of the policy which limit or deny the plaintiff's recovery. *Id.*

■■■ Because Service Finance was not required to introduce the policies in evidence in order to prove their relevant terms, its failure to do so does not constitute evidence that it failed to prove the

pertinent terms of the policies. Accordingly, we review the entirety of the record to determine whether Service Finance established the relevant policy terms as a matter of law. *See Sterner,* 767 S.W.2d at 690; *La Grange,* 989 S.W.2d at 100.

Anthony Ciervo, Jr., who was Adriatic's president during the pertinent time period, provided deposition testimony which was introduced at trial regarding Adriatic policies in general and the policies at issue. He testified that when a premium finance company requested cancellation of a policy the short-rate refund applied, but when Adriatic cancelled the policy, the pro rata refund applied. Adriatic cancelled the Davis policy. When it did so, Adriatic credited ARM for the amount of the unearned premiums under the policy on ARM's account current with Adriatic. Ciervo testified that, because Service Finance cancelled the Blanchard and Wallsten policies, the short-rate refund applied.[15] When these policies were cancelled, Adriatic likewise credited the refunds to ARM's account current.

Ciervo explained that he generally relies on ARM's calculation of premium refunds and that Adriatic "spot check[s] maybe one out of ten." He has never noticed any problems with ARM's premium refund calculations. According to cancellation notices issued by Adriatic, the short-rate refund applicable to the Wallsten policy was $624.13.[16] The pro rata refund for the Davis policy was $12,498 .34. The short-rate refund due under the Blanchard policy was $205.62.[17] ARM vice-president John McKinney testified that a refund un-

---

**15.** Ciervo testified that ARM mistakenly cancelled the Wallsten policy "pro rata." Nevertheless, he explained that the policy should have been cancelled "short rate."

**16.** ARM president Tim Hunt signed these notices as an "authorized representative" of Adriatic.

**17.** These figures include unearned premiums and unearned premium receipts taxes.

der the policies would include both unearned premiums and unearned taxes.

■■■■ When a party judicially admits the contents of a writing, his adversary may introduce that testimony as evidence of the contents without producing the writing. *See Hoefling v. Hambleton,* 84 Tex. 517, 519, 19 S.W. 689, 690 (1892); *Valadez v. Barrera,* 647 S.W.2d 377, 383 (Tex. App.—San Antonio 1983, no writ). "A judicial admission is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it." *Hennigan v. I.P. Petroleum Co.,* 858 S.W.2d 371, 372 (Tex.1993) (quoting *Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex. 1980)); *Parkway Hosp., Inc. v. Lee,* 946 S.W.2d 580, 588 (Tex.App.—Houston [14th Dist.] 1997, writ denied). The rationale behind this rule "is that it would be unjust to permit a party to recover after he has sworn himself out of court by clear, unequivocal testimony." *Mendoza,* 606 S.W.2d at 694 (citing *United States Fidelity & Guar. Co. v. Carr,* 242 S.W.2d 224, 229 (Tex.Civ.App.—San Antonio 1951, writ ref'd)).

■■■■ Generally, a party's testimonial declarations are considered "quasi-admissions" which are not conclusive upon the declarant and constitute merely some evidence of the facts admitted. *Hennigan,* 858 S.W.2d at 372; *Mendoza,* 606 S.W.2d at 694; *Parkway Hosp.,* 946 S.W.2d at 588. Such quasi-admissions become conclusive judicial admissions when: (1) they are made during the course of a judicial proceeding; (2) they are contrary to an essential fact embraced in the theory of recovery or defense asserted by the declarant; (3) they are clear, deliberate, and unequivocal; (4) giving them conclusive effect is consistent with the rationale behind the rule; and (5) they are not also destructive of the opposing party's theory of recovery or defense. *Mendoza,* 606 S.W.2d at 694 (citing *United States Fidelity & Guar.,* 242 S.W.2d at 229); *Hill v. Spencer & Son, Inc.,* 973 S.W.2d 772, 776 (Tex.App.—Texarkana 1998, no pet.); *accord Hennigan,* 858 S.W.2d at 372.

Ciervo's deposition testimony introduced at trial and McKinney's trial testimony constitute judicial admissions of the pertinent policy terms. *See Hennigan,* 858 S.W.2d at 372; *Mendoza,* 606 S.W.2d at 694; *Parkway Hosp.,* 946 S.W.2d at 588. Their testimony establishes that short-rate refunds were owed on the Wallsten and Blanchard policies and a pro rata refund was owed on the Davis policy. The ARM cancellation notices establish the amount of the refunds due under the policies. Accordingly, the record contains no evidence to support Finding of Fact No. 31 that Service Finance failed to prove the relevant terms of the policies. Service Finance established the relevant policy terms as a matter of law. *See Sterner,* 767 S.W.2d at 690; *La Grange,* 989 S.W.2d at 100.

■■■■ Adriatic bore the burden of proving that Service Finance had failed to satisfy all conditions precedent to recovery. *See Texas Farmers Ins.,* 996 S.W.2d at 879; *Paragon Sales,* 774 S.W.2d at 661. Therefore, Finding of Fact No. 32 that Service Finance failed to prove that all conditions precedent to recovery had been satisfied is immaterial. Finally, because Service Finance established the pertinent policy terms, Conclusion of Law No. 6 that Service Finance cannot recover because it failed to introduce all the policy terms in evidence is erroneous as a matter of law. *See Kolb,* 982 S.W.2d at 952; *Hitzelberger,* 948 S.W.2d at 503.

For these reasons, we sustain Service Finance's tenth issue.

## BREACH OF INSURANCE CONTRACT BY ADRIATIC

Service Finance argues in its seventh issue that Adriatic breached its insurance contracts with Wallsten, Davis, and Blanchard "to which Service had succeeded under the contractual assignment clauses." Thus, it contends that there is no evidence to support Findings of Fact Nos. 26 to 28, in which the court found that Adriatic did not breach the terms of its contracts with these insureds. Service Finance avers in its fifth issue that there is no evidence to support Finding of Fact No. 22 that it had no contract with Adriatic.[18] Service Finance also avers that such findings are against the great weight and preponderance of the evidence. Service Finance similarly contends in its fourth issue that the evidence establishes as a matter of law that Adriatic breached its contractual obligations to refund to Service Finance the unearned premiums due under the policies.[19]

As we have previously observed, article 24.17 and its accompanying regulations operate to define the rights and obligations of the parties to an insurance transaction in which the premiums have been financed and the insured subsequently defaults on the finance agreement. Thus, these statutes and regulations establish the timing of the refunds owed in this case. Because the timing of the refunds depends on whether a premium finance company has provided proper notice to the insurer, we also address at this juncture Service Finance's first issue, in which it contends that there is no evidence to support Findings of Fact Nos. 7 and 12 that it failed to give timely notice to Adriatic of its premium finance agreements with Davis and Wallsten, or alternatively, that such findings are contrary to the great weight and preponderance of the evidence. Service Finance's first issue also challenges the court's Conclusion of Law No. 1 in which the court determined that Adriatic had no obligation to directly refund any unearned premiums to Service Finance on the Davis and Wallsten policies because of the lack of notice.

### POWERS OF ATTORNEY

Service Finance offered in evidence the premium finance agreements executed in its favor by Wallsten, Davis, and Blanchard. Each agreement gives Service Finance a power of attorney to cancel the policy financed and collect any unearned premiums. Each also gives Service Finance a security interest in any "unearned premiums and loss payments on the insurance policy being purchased."

■■■■ By a power of attorney, a person appoints another as his agent and attorney-in-fact. See Comerica Bank–Tex. v. Texas Commerce Bank Nat'l Ass'n, 2 S.W.3d 723, 725 (Tex.App.—Texarkana

---

**18.** Service Finance also contends in its fifth issue that there is no evidence to support Finding of Fact No. 21 that it did not have a contract with ARM and that such finding is against the great weight and preponderance of the evidence. We address the portion of Service Finance's fifth issue regarding ARM separately hereinafter.

**19.** Service Finance also contends in its seventh issue that there is no evidence to support Findings of Fact Nos. 23 to 25, in which the court found that Wallsten, Davis, and Blanchard did not have contracts with ARM, or alternatively, that such findings are against the great weight and preponderance of the evidence. Service Finance also claims in its fourth issue that the evidence establishes as a matter of law that ARM breached its contractual obligations to refund to Service Finance the unearned premiums due under the policies. We address the portions of Service Finance's fourth and seventh issues regarding ARM separately hereinafter.

1999, pet. denied); *Smith v. Lanier,* 998 S.W.2d 324, 334 (Tex.App.—Austin 1999, pet. denied). A power of attorney authorizes the agent to perform specified acts on behalf of the principal. *See Comerica Bank–Tex.,* 2 S.W.3d at 725. As a general rule however, a power of attorney does not authorize the agent to file suit in his own name on his principal's contract. *See Tinsley v. Dowell,* 87 Tex. 23, 27–28, 26 S.W. 946, 948 (1894); *Perry v. Breland,* 16 S.W.3d 182, 187 (Tex.App.—Eastland 2000, pet. denied); *Prudential Petroleum Corp. v. Rauscher, Pierce & Co.,* 281 S.W.2d 457, 460 (Tex.Civ.App.—Dallas 1955, writ ref'd n.r.e.). If the agent has an interest in the subject matter of the contract though, the agent may prosecute a lawsuit on the contract in his own right. *See Cavaness v. General Corp.,* 155 Tex. 69, 75, 283 S.W.2d 33, 37 (1955); *Tinsley,* 87 Tex. at 28, 26 S.W. at 948; *Perry,* 16 S.W.3d at 187; *Prudential Petroleum,* 281 S.W.2d at 460.

Case law suggests that a power of attorney executed in connection with the conveyance of a security interest is the kind of power under which an agent can sue in his own name. *See Tinsley,* 87 Tex. at 30, 26 S.W. at 949 ("[i]f Dowell had an interest in the land,—*as, for instance, a lien upon it,*—his right could not be prejudiced"); *Nelson v. Consumers County Mut. Ins. Co.,* 326 S.W.2d 535, 538 (Tex.Civ.App.—San Antonio 1959, writ dism'd) ("[t]he mortgagee, under the terms of the mortgage, had the authority to make the claim in its own name"); *Bryan v. Ross,* 214 S.W. 524, 525 (Tex.Civ.App.—Amarillo 1919) ("where the power is given as security, or is coupled with an interest, then it is irrevocable"), *aff'd sub. nom. Bowles v. Bryan,* 247 S.W. 276 (Tex. Comm'n App. 1923, judgm't adopted). The focus seems to be on the revocability of the power of attorney. *See Tinsley,* 87 Tex. at 29–30, 26 S.W. at 948–49 (citing *Hunt v. Rousmanier's Adm'rs,* 21 U.S. (8 Wheat.) 174, 203–

05, 5 L.Ed. 589, 597 (1823)); *Nelson,* 326 S.W.2d at 538; *Bryan,* 214 S.W. at 525.

In *Tinsley,* the Court had before it a power of attorney granted in connection with a sale of land. The prospective sellers appointed Dowell to be their agent to find a purchaser for two tracts of land. They agreed to pay Dowell a certain commission but reserved to themselves the authority to convey the property. Dowell negotiated a deal with Tinsley for the purchase of both tracts and they executed a sales contract. Tinsley later decided against consummating the transaction, and Dowell sued him on the contract. Tinsley responded that Dowell could not sue him because he had no interest in the property. *See Tinsley,* 87 Tex. at 26–27, 26 S.W. at 947.

The Supreme Court agreed with Tinsley's argument. The Court observed:

An interest in the subject of contract for the sale of land by an agent can exist only where the power to sell is such as the principal cannot revoke at any time before it is executed. If it carries an interest in the land itself, it cannot be revoked until the right expires. This is a fair test of this contract: Did it, as between Rogers and wife and Dowell, vest in the latter such an interest that the former could not revoke it? If so, Dowell can sue on the contract with Tinsley. If not, he cannot maintain the suit.

*Id.* at 29, 26 S.W. at 948.

According to the Restatement (Second) on Agency, an agent who holds a power of attorney in connection with a security interest is in essence an assignee of his principal.

Even though the agent has not settled with his principal, he may, by agreement with the principal, have a right to receive payment and out of the proceeds

to reimburse himself for advances and commissions before turning the balance over to the principal. In such a case, although there is no formal assignment, the agent is in the position of a transferee of the whole claim for security....

RESTATEMENT (SECOND) OF AGENCY § 372 cmt. a (1958).

■ Although we cannot agree that Service Finance had "contractual assignments" from its debtors, the premium finance contracts at issue each contain an irrevocable power of attorney coupled with a security interest. The powers of attorney could not be revoked until the debtors completed their obligations under the finance contracts. Thus, the powers of attorney authorize Service Finance to file suit in its own name to collect any unearned premiums refunded.

Service Finance's authority to sue arises from its contracts with the debtors and not from any contract it had with Adriatic. Thus, Finding of Fact No. 22 regarding the lack of a contract between Service Finance and Adriatic is supported by the evidence but immaterial. Accordingly, we overrule Service Finance's fifth issue insofar as it challenges this finding.

The parties do not dispute that the insureds in this case defaulted on their premium finance agreements and that the policies at issue were cancelled. Accordingly, we now examine whether the evidence establishes as a matter of law that Adriatic failed to properly refund the unearned premiums due under the policies.

## FAILURE TO REFUND UNEARNED PREMIUMS

Ciervo's and McKinney's testimony, the cancellation notices, and the premium finance agreements establish that Service Finance was entitled to a refund of $601.00 in unearned premiums on the Wallsten policy. The evidence similarly reflects that Service Finance was entitled to a refund of $12,035.00 on the Davis policy and $198.00 on the Blanchard policy for unearned premiums.[20] The parties agree that Service Finance has received refunds of $603.20 under the Wallsten policy and $198.00 under the Blanchard policy. The parties also agree that Service Finance has not received any refund on the Davis policy.

## NOTICE

■ The timing of the refunds due Service Finance depends on whether it provided Adriatic timely notice that the policies were being financed and that the premium finance agreements contained assignments and powers of attorney for the benefit of Service Finance.[21] *See* TEX. INS. CODE ANN. art. 24.17(f). Article 24.22 required Service Finance to provide notice to Adriatic within thirty days after it received the premium finance agreements from the local agents. *Id.* art. 24.22.

If Service Finance gave Adriatic the notice required by article 24.22, then Adriatic had to refund the unearned premiums directly to Service Finance within sixty days after cancellation. *Id.* art. 24.17(f). If Service Finance did not provide timely notice, then Adriatic could satisfy its duty to refund the unearned premiums by refunding the premiums through ARM. *Id.*

---

**20.** Although a refund of $12,035.00 is owed on the Davis policy, Service Finance provided financing for only $11,517.00 of the total premiums of $17,346.07 originally paid. However, the principal and interest owed on these contracts totaled $12,307.84. We do not ad-

dress the right of Davis, if any, to the unearned premiums to be refunded under this policy.

**21.** The timeliness of the refund is pertinent to the issue of prejudgment interest.

However, Adriatic could not satisfy this obligation by returning the premiums to ARM through an account current. *See* 28 Tex. Admin. Code § 25.509. Whether directly or through ARM, the unearned premiums should have been refunded to Service Finance within 120 days after cancellation. *See* 28 Tex. Admin. Code § 25.504.

The version of article 24.17(f) applicable to this case does not clearly require a refund within 120 days if proper notice is not given. Rather, the statute provides that Adriatic remains "liable for the return of unearned *commission* to the premium finance company if the agent has not returned the same to the premium finance company within 120 days after the agent has been notified of the cancellation." Tex. Ins.Code Ann. art. 24.17(f) (emphasis added). Nevertheless, the Board adopted a 120 day requirement when it promulgated section 25.504, which requires refund of "the total unearned premium" within 120 days. *See* 28 Tex. Admin. Code § 25.504.

■■■ Adriatic contends that this 120 day rule conflicts with the statute and, thus, the statute controls. *See Fleming Foods of Tex.*, 6 S.W.3d at 282. To determine whether an administrative regulation conflicts with a statute, we examine whether the regulation is "in harmony with the general objectives of the Act involved." *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex.1992) (quoting *Gerst v. Oak Cliff Sav. & Loan Ass'n*, 432 S.W.2d 702, 706 (Tex.1968)); *Texas Home Mgt., Inc. v. Texas Dep't of Mental Health & Mental Retardation*, 953 S.W.2d 1, 3 (Tex.App.—Austin 1997, pet. denied).

Article 24.09 empowers the Board "to adopt and enforce rules necessary to carry out this chapter." Tex. Ins.Code Ann. art. 24.09. Article 24.17(f) plainly requires an insurer to refund unearned premiums to the premium finance company if proper notice is given. However, the statute does not make specific provisions for the disposition of unearned premiums in the event the premium finance company fails to give proper notice. The statute does say that the insurer "may satisfy any legal obligation it has to return the unearned premiums due under the insurance contract to the insurance premium finance company by returning said unearned premiums through the insurance agent or agencies writing the insurance." *Id.* art. 24.17(f).

Consistent with the statute, title 28, section 25.504 of the Administrative Code provided that the insurer could refund unearned premiums "either directly or through the agent or agency writing the insurance." 28 Tex. Admin. Code § 25.504. The portion of this regulation which seems to conflict with the statute provides, "The *canceling company* shall pay the entire amount of unearned premium, which includes the portion of the unearned part of the agent's commission, directly to the insurance premium finance company." *Id.* (emphasis added).

As previously stated, chapter 24 of the Insurance Code was adopted for the protection of the premium finance industry. We review section 25.504 to see whether it is in harmony with this objective. *See Lone Star Gas*, 844 S.W.2d at 685; *Texas Home Mgt.*, 953 S.W.2d at 3. Because the State Board of Insurance used the term "canceling company" rather than "insurer" in the sentence quoted above, we conclude that the Board intended that the insurer or its agent must directly refund unearned premiums to the premium finance company, depending on whether the insurer elects to refund these premiums directly or through its agent. Thus, the premium finance company's security interest is protected, which is consistent with the objec-

tives of chapter 24 of the Insurance Code.[22]

As noted by the Supreme Court, the insurer bears the burden of pleading and proving as an affirmative defense anything which limits Service Finance's right to recover under the policies. *See Texas Farmers Ins.*, 996 S.W.2d at 879; *Paragon Sales*, 774 S.W.2d at 661. Thus, Adriatic bore the burden of proving that it did not receive the notice required by article 24.22.

Ciervo testified that Adriatic did not receive notice from Service Finance that the latter had premium finance agreements for the Wallsten and Davis policies. Brenda Brown testified that she mailed notice to Adriatic regarding the Wallsten transaction but conceded that she sent it more than thirty days after Service Finance received the premium finance agreement. Thus, her own testimony establishes that the notice was untimely, as the court found.

Because Service Finance did not provide timely notice under article 24.22, Adriatic had 120 days to provide the $601.00 premium refund required by the Wallsten policy. *See* 28 TEX. ADMIN. CODE § 25.504. Service Finance gave notice of cancellation of the Wallsten policy on January 13, 1986. ARM mailed a $603.20 refund on the Wallsten policy to Service Finance on June 16, more than 120 days after the cancellation notice. Accordingly, the refund was untimely.

Brown testified that she mailed timely notice to Adriatic that Service Finance had premium finance agreements for the original Davis policy and the endorsement to that policy. Ciervo and McKinney denied that Adriatic or ARM ever received these notices. Because of the conflicting testimony, we conclude that the court's finding that Service Finance failed to provide Adriatic the required notice is supported by some evidence and is not contrary to the great weight and preponderance of the evidence.

Adriatic cancelled the Davis policy on February 9, 1986. Under the terms of the policy, Service Finance was entitled to a pro rata premium refund of $12,035.00. Because Service Finance did not provide the notice required by article 24.22, Adriatic was obligated to provide this refund no later than June 9, 1986, 120 days after cancellation. *Id.* Adriatic credited ARM's account current with $12,035.00 on the Davis policy. However, this did not satisfy Adriatic's obligation. *See* 28 TEX. ADMIN. CODE § 25.509. Accordingly, Adriatic remains liable to Service Finance for this refund.[23]

The court found that Service Finance gave proper notice in connection with the Blanchard transaction. Adriatic does not challenge this finding. Thus, Adriatic was obligated to refund $198 .00 directly to Service Finance within sixty days after

**22.** Holding the insurer liable if its agent fails to refund the unearned premiums within 120 days is also consistent with article 24 .17(f)'s treatment of unearned commissions. *See* TEX. INS.CODE ANN. art. 24.17(f). This portion of the statute permits the insurer to retain unearned commissions from the unearned premiums refunded directly to the premium finance company. If the agent fails to refund the unearned commissions within 120 days, the insurer is liable to the premium finance company for this part of the refund as well.

**23.** It could be argued that it would be impossible for Adriatic to comply with the requirements of the statute because Service Finance did not provide the notice required by article 24.22. However, the record affirmatively reflects that Adriatic received actual notice of Service Finance's security interest when Service Finance sent notice to COT, ARM and Adriatic in April 1986 that Davis had defaulted on his premium finance contract. This notice gave Adriatic ample opportunity to comply with the 120 day refund requirement.

cancellation. ARM issued a $198.00 refund to Service Finance thirty-one days after the latter gave notice of cancellation. Thus, Adriatic provided Service Finance a timely refund under the Blanchard contract.

### Summary

The evidence shows that Service Finance received a timely premium refund on the Blanchard policy. Accordingly, the record contains more than a scintilla of evidence to support Finding of Fact No. 28 that Adriatic did not breach any of the terms of the Blanchard policy, and the evidence is factually sufficient to support that finding.

However, the record contains no probative evidence that Adriatic provided a timely premium refund on the Wallsten policy or any premium refund on the Davis policy. Rather, the evidence establishes the contrary as a matter of law. Accordingly, Findings of Fact Nos. 26 and 27 that Adriatic did not breach any of the terms of these policies are contrary to the great weight and preponderance of the evidence.

Thus, we sustain Service Finance's seventh issue in part, insofar as it challenges the judgment rendered in favor of Adriatic on the Wallsten and Davis policies. Because the court's findings concerning Service Finance's failure to give proper notice on the Davis and Wallsten policies are supported by some evidence and are not contrary to the great weight and preponderance of the evidence, we overrule Service Finance's first issue.

Because the evidence establishes that Adriatic breached its contractual obligations under the Wallsten and Davis policies, the court's Conclusion of Law No. 4 that Adriatic is not liable to Service Finance for breach of any contractual agreement is erroneous as a matter of law. Thus, we sustain Service Finance's fourth
issue insofar as it challenges the judgment rendered in favor of Adriatic on these policies.

## BREACH OF CONTRACT BY ARM

■■■ Service Finance contends in its fifth and seventh issues that there is no evidence to support Findings of Fact Nos. 21 and 23 to 25, in which the court found that ARM did not have contracts with Wallsten, Davis, Blanchard, or Service Finance, or alternatively, that such findings are contrary to the great weight and preponderance of the evidence. It argues in its fourth issue that it is entitled to judgment as a matter of law against ARM for breach of contract. Thus, it claims that the court's Conclusion of Law No. 5 that ARM is not liable to Service Finance for breach of contract is erroneous. Service Finance asserts in its sixth issue that the existence of an express contract with ARM is irrelevant given ARM's status as Adriatic's agent.

■■■ Service Finance had the burden to prove all relevant policy terms which establish its right to recover from ARM. *See Texas Farmers Ins.*, 996 S.W.2d at 879; *Paragon Sales*, 774 S.W.2d at 661. It offered no evidence that ARM is even mentioned in the insurance policies at issue in this case. McKinney testified in his deposition that ARM acted as the "middle man" in these transactions, forwarding the premiums to Adriatic and the policies to the local agents.

From this evidence we conclude that the challenged findings are supported by some evidence and are not contrary to the great weight and preponderance of the evidence. We likewise determine that the challenged conclusion is not erroneous. Accordingly, we overrule Service Finance's fourth, fifth, sixth, and seventh issues insofar as they challenge the judgment rendered in favor

of ARM on Service Finance's contract claims for unearned premiums.[24]

## FAILURE TO REFUND UNEARNED PREMIUM RECEIPTS TAXES

■ Service Finance's fourth and seventh issues also concern the failure of Adriatic or ARM to refund the unearned premium receipts taxes which accrued upon cancellation of the policies.[25] Article 1.14–2, section 12(a) requires a surplus lines agent such as ARM to collect applicable premium receipts taxes and pay them to the State. *See* Tex. Ins.Code Ann. art. 1.14–2, § 12(a). The pertinent regulation provides that any refund of such taxes "shall be effected by the surplus lines agent." 28 Tex. Admin. Code § 15.24(c)(3). Accordingly, we conclude that Adriatic had no obligation to refund the unearned premium receipts taxes to Service Finance.

Ciervo's and McKinney's testimony and the cancellation notices establish that Service Finance was entitled to tax refunds of $23.13 on the Wallsten policy, $463.34 on the Davis policy, and $7.62 on the Blanchard policy. The undisputed evidence shows that Service Finance has received only $2.20 on the Wallsten policy.[26] Accordingly, the record contains no evidence that ARM has fully refunded the unearned premium receipts taxes due upon cancellation of the policies. Rather, the evidence establishes the contrary as a matter of law. Accordingly, we sustain Service Finance's fourth and seventh issues insofar as they challenge the judgment rendered in favor

of ARM on Service Finance's tax refund claims. We overrule these issues insofar as they challenge the judgment rendered in favor of Adriatic on these claims.

## PREJUDGMENT INTEREST

■ Service Finance's eleventh issue challenges in part the court's failure to award prejudgment interest. Appellees present no response to this claim in their briefs. The interest statute in effect when Service Finance's claims arose provided:

When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

Act of May 24, 1979, 66th Leg., R.S., ch. 707, § 1, *repealed by* Act of June 2, 1997, 75th Leg., R.S., ch. 1396, § 48, 1997 Tex. Gen. Laws 5202, 5250 (current version at Tex. Fin.Code Ann. § 302.002 (Vernon Supp.2001)).

■ Service Finance had the burden to prove all relevant terms of the insurance policies. *See Texas Farmers Ins.*, 996 S.W.2d at 879; *Paragon Sales*, 774 S.W.2d at 661. Thus, to obtain prejudgment interest under the statute, it had the burden of proving that the insurance policies did not specify a particular rate of interest. *See Childs v. Taylor Cotton Oil Co.*, 612 S.W.2d 245, 251 (Tex.Civ.App.—Tyler 1981, writ ref'd n.r.e.); *Miles v. W.C. Rob-*

---

24. We also note that the pertinent regulations impose responsibility on the insurer rather than the agent to pay unearned premium refunds to the premium finance company. *See* 28 Tex. Admin. Code §§ 25.504, 25.509.

25. We believe the question of unearned premium receipts taxes is "fairly included" in the argument pertinent to these issues. *See* Tex. R.App. P. 38.1(e), 38.9 (directing appellate

courts to liberally construe briefs and address every issue fairly included within a point presented for review); *Williams v. Bank One, Tex., N.A.*, 15 S.W.3d 110, 114 (Tex.App.—Waco 1999, no pet.).

26. This represents the amount ARM refunded to Service Finance in excess of the premium refund to which it was entitled on this policy.

*erts Lumber Co.*, 561 S.W.2d 256, 258 (Tex. Civ.App.—Eastland 1978, writ ref'd n.r.e.); *Heaner v. Houston Sash & Door Co.*, 560 S.W.2d 525, 526–27 (Tex.Civ.App.—Waco 1977), *rev'd on other grounds*, 577 S.W.2d 217 (Tex.1979).

Service Finance failed to offer any evidence that the insurance policies do not provide for a particular rate of interest. Accordingly, it is not entitled to prejudgment interest under the statute. *Id.* Therefore, we overrule Service Finance's eleventh issue insofar as it challenges the court's failure to award prejudgment interest.[27]

## ATTORNEY'S FEES

Service Finance's eleventh issue also challenges the court's failure to award attorney's fees. It contends that there is no evidence to support Finding of Fact No. 33, in which the court found that it failed to segregate that portion of its attorney's fees attributable to the breach of contract claims, or alternatively, that such finding is contrary to the great weight and preponderance of the evidence. Service Finance also argues that the court's Conclusion of Law No. 8 that it is not entitled to attorney's fees is erroneous.

■ Service Finance contends that it is entitled to attorney's fees under either section 38.001(8) of the Civil Practice and Remedies Code, which permits a prevailing party to recover attorney's fees in a suit on a contract, or under the Uniform Declaratory Judgments Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 37.009, 38.001(8) (Vernon 1997). Appellees respond that Service Finance's declaratory judgment action is improper because it merely raises the same issues already before the court

when Service Finance first sought declaratory relief in its seventh amended petition. We agree and conclude that Service Finance cannot recover attorney's fees under the Declaratory Judgments Act. *See BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 841 (Tex.1990) (orig.proceeding); *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 730 (Tex.App.—Waco 1998, pet. denied) (both holding that a party may not seek declaratory relief to settle matters already pending before the court).

■ On Service Finance's contract theory, ARM asserts that, because it is not liable under the insurance policies, it is not liable for attorney's fees. We agree and overrule Service Finance's eleventh issue insofar as it challenges the court's failure to tax attorney's fees against ARM.

■ Adriatic responds that, because Service Finance's claim is based on an insurance contract, section 38.006 of the Civil Practice and Remedies Code bars any recovery of attorney's fees under section 38.001. *Id.* § 38.006 (Vernon 1997). Section 38.006 provides that attorney's fees are not available under chapter 38 of the Code for insurance contracts that are subject to various named provisions of the Insurance Code, including article 21.21 and the Unfair Claim Settlement Practices Act (article 21.21–2). *Id.* § 38.006(4), (5). Adriatic argues that, because the policies are subject to these provisions, Service Finance cannot recover attorney's fees under section 38.001(8).

The statutory language seems to support Adriatic's position. However, the Supreme Court has recently held that section 38.006 will bar a recovery of attorney's fees under section 38.001 only if "the insurer is liable for attorney's fees under

27. Accordingly, Adriatic's failure to provide a timely refund on two of the three policies is immaterial.

another statutory scheme." *See Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex.2000). Because Service Finance has not sought to hold Adriatic liable under any of the provisions listed in section 38.006, we conclude that it can recover attorney's fees under section 38.001(8).

Service Finance's trial counsel testified that he has a contingent fee contract with Service Finance which provides that he receive forty percent of any recovery in the event the case goes to trial. He testified in the alternative that, if a contingent fee contract is inappropriate in this case, he believes $7,500 to be a reasonable fee for preparation and trial. Counsel further testified that the following would be reasonable appellate attorney's fees: $7,500 for an appeal to this Court, $2,500 for filing or responding to a petition for review to the Supreme Court, and $1,500 if the case is argued before the Supreme Court.

Adriatic responds that counsel's testimony is inadequate to justify an attorney's fee award at this juncture because counsel failed to segregate the fees attributable to its breach of contract claims from the fees attributable to its other claims. However, segregation is unnecessary:

> when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their "prosecution or defense entails proof or denial of essentially the same facts." *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 624–25 (Tex.App.—Dallas 1987, writ denied). Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are "intertwined to the point of being inseparable," the party suing for attorney's fees may recover the entire amount covering all claims. *Gill Sav. Ass'n v. Chair King,*

*Inc.*, 783 S.W.2d 674, 680 (Tex.App.— Houston [14th Dist.] 1989), *modified*, 797 S.W.2d 31 (Tex.1990).

*Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11–12 (Tex.1991); *accord Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex.1997). Service Finance's claims fit within this exception to the segregation requirement.

A trial court must award attorney's fees to the prevailing party in a suit founded on a written or oral contract if there is evidence of the reasonableness of the fees. *See World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 683 (Tex. App.—Fort Worth 1998, pet. denied); *Caldwell & Hurst v. Myers*, 714 S.W.2d 63, 65–66 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8). A court has discretion in fixing the amount of attorney's fees. *See World Help*, 977 S.W.2d at 683; *Caldwell & Hurst*, 714 S.W.2d at 65. However, it has no discretion to entirely deny attorney's fees established under section 38.001. *See Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex.1998); *World Help*, 977 S.W.2d at 683; *Caldwell & Hurst*, 714 S.W.2d at 65.

Because the court determined that Service Finance had no contract with Adriatic or ARM, it concluded that Service Finance is not entitled to attorney's fees and made no findings regarding reasonable attorney's fees under section 38.001. Because of our opinion that Service Finance may sue on the insurance policies Adriatic had with Wallsten, Davis, and Blanchard, Service Finance is entitled to attorney's fees from Adriatic under section 38.001. However, the court has not yet exercised its discretion with respect to the amount of attorney's fees which Service Finance may recover. Accordingly, we will remand the attorney's fee issue for a determination of the amount of attorney's fees which Ser-

vice Finance may recover. *See City of Sherman v. Henry,* 928 S.W.2d 464, 474 (Tex.1996); *National Cas. Co. v. Lane Express, Inc.,* 998 S.W.2d 256, 266 (Tex. App.—Dallas 1999, pet. denied).

We sustain Service Finance's eleventh issue insofar as it challenges the court's failure to award attorney's fees and tax those fees against Adriatic.[28]

## CONCLUSION

The record demonstrates that Adriatic provided Service Finance a refund of unearned premiums on the Blanchard and Wallsten policies. However, the evidence establishes as a matter of law that Adriatic failed to provide such a refund to Service Finance on the Davis policy. The evidence also establishes as a matter of law that ARM failed to provide the required refund of unearned premium receipts taxes on any of the three policies.

Service Finance failed to proffer any evidence that the policies do not specify a particular rate of interest. Thus, it is not entitled to prejudgment interest.

Because ARM is not liable to Service Finance under the insurance policies, Service Finance may not recover attorney's fees from ARM. However, Service Finance can recover these fees from Adriatic.

Accordingly, we reverse the judgment and render judgment that Service Finance recover: (1) from Adriatic, $12,035.00 in unearned premiums; and (2) from ARM, $491.89 in unearned premium receipts taxes. We sever Service Finance's attorney's fee claim against Adriatic and remand that portion of the case to the trial court for further proceedings consistent with this opinion. *See Fletcher v. Edwards,* 26 S.W.3d 66, 80 (Tex.App.—Waco 2000, pet.

denied); *Jones v. Fuller,* 856 S.W.2d 597, 605 (Tex.App.—Waco 1993, writ denied).

**28.** In view of our rulings on Service Finance's first, third, fourth, seventh, eighth, tenth, and eleventh issues, we need not discuss the remainder of the issues presented.